ED STINN CHEVROLET, INC., APPELLEE, *v.* NATIONAL CITY BANK, APPELLANT.

[Cite as Ed Stinn Chevrolet, Inc. *v.* Natl. City Bank (1986), 28 Ohio St. 3d 221.]

(No. 86-205—Decided December 30, 1986.)

(Rehearing granted — February 4, 1987.)

*Berkman, Gordon, Murray & Palda, J. Michael Murray* and *Lorraine R. Baumgardner,* for appellee.

*Jones, Day, Reavis & Pogue, Robert J. Hoerner, Kathleen B. Burke* and *Jon A. Christensen,* for appellant.

*Roger Blair,* urging reversal for *amicus curiae,* First Community Bank.

*Jane Hils Shea,* urging reversal for *amicus curiae,* Fifth Third Bank.

*Jeffrey D. Quayle,* urging reversal for *amicus curiae,* Ohio Bankers Assn.

*Per Curiam.* The central problem presented by this action is which of two innocent parties should bear the loss of this embezzlement–check forger scheme—the thief's employer or the employer's bank. To facilitate consideration of this devilishly complex appeal, we will first outline the various legal arguments presented. The second part of our opinion will then apply the controlling state law to the curious facts at hand.

## I

In its appeal to this court, appellant National City challenges the appellate ruling in two broad propositions of law. In the first, appellant argues that the court of appeals erred in applying the "properly payable" provisions of R.C. 1304.24(A). Appellant reasons that it did not make a payment because, in actuality, a "wash" transaction occurred. This thesis is premised on the UCC's "final payment rule" which is interpreted by appellant as providing that " 'when the same person is the drawer and the payee, he cannot assert a right against the drawee bank based on UCC § 4-213 [R.C. 1304.19].' " In this regard, the bank theorizes that the drawer-payee-customer (Stinn) has not parted with anything of value insofar as the banking transaction is concerned since the funds were first debited and then credited to the same account in an in-and-out process.

Appellant also contends that Stinn, in fact, received the money drawn by the check because the funds were paid into its account. In cases where the customer actually receives the funds at issue, appellant alleges that the customer cannot later maintain an action for wrongful payment. This is because any liability was extinguished when the bank credited Stinn's account. The bank reasons that "recredit," as used in this court's decision in *Cincinnati Ins. Co.* v. *First Natl. Bank* (1980), 63 Ohio St. 2d 220 [17 O.O.3d 136], was neither necessary nor feasible since Stinn already had the funds. Further, appellee is barred from recovery because even if the initial payment was wrongful, Stinn has already received, as payee, the payment proceeds.

Appellant further asserts that its payments were not in fact unauthorized because Stinn's rubber-stamped endorsement on the back of the check constitutes the customer's direction to pay the check.

Lastly, appellant advises that appellee breached its endorsement warranty that the payee signatures were not forged; that is, that appellee had "good title." See R.C. 1304.13(A)(1). Similarly, under R.C. 1304.13(A)(2), Stinn warranted that it had no "knowledge" of a bogus drawer signature. Because Stinn should be charged with the forger-agent's (*i.e.,* bookkeeper Hajjar's) knowledge of the drawer signature forgeries, this warranty was breached as well. Accordingly, Stinn's presentation of instruments with forgeries is a breach of its presentment warranty which precludes its recovery of the funds.

Appellant's second proposition of law concerns only those checks containing two valid drawers' signatures, but forged endorsements. National City essentially argues that, pursuant to R.C. 1303.41, there can be no action against a drawee (bank) where the drawer's (customer's) agent-embezzler has drawn the check, or ordered it drawn, with an intent that the named payee (fictitious or otherwise) will have no interest in the instrument. In such cases, the forged endorsement is effective and precludes a "properly payable" claim by reason of such forged endorsement. In this case, appellant points out that it is beyond dispute that the "person sign-

ing" (R.C. 1303.41[A][2]) or the "agent or employee" (R.C. 1303.41[A][3]) of Stinn (*i.e.,* Hajjar) never intended the named payee to have an interest.

Appellee Stinn raises several theories to both refute appellant's contentions and to justify the court of appeals' decision.

In its first argument, appellee contends that appellant failed to exercise ordinary care in discovering the forgeries and that this breach resulted in a compensable loss. Appellee explains that the bank is liable regardless of the customer's negligence in this case because R.C. 1304.24 places the loss on the bank for items debited which were not properly payable. Appellee acknowledges that the risk is on the customer for checks processed after the customer could have inspected older cancelled checks for unauthorized signatures and notified the bank (R.C. 1304.29[B]). Appellee also agrees that the risk of loss is initially cast on the customer if it "substantially contributes" to the making of a forgery (R.C. 1303.42). However, appellee asserts that lack of ordinary care by appellant shifted liability to the bank regardless of its customer's negligence. Further, the bank has no defense premised on its customer's negligence because it was proven that the bank's negligent check processing was not conducted in accordance with the "reasonable commercial standards" imposed by R.C. 1303.42.

Appellee contends that, as a matter of special contract between these two parties, the bank breached the terms of its agreement with its customer because it did *not* refuse to honor any check bearing a forgery. Appellee asserts that this failure to live up to its promise was admitted by bank officers at trial, and that since the jury determined that appellant was negligent in this regard, under UCC contract law, appellee's contributory negligence, contrary to appellant's assertions, does not alter the bank's liability.

Stinn also claims that its rubber-stamped endorsement by the forger did not authorize the bank to pay forged checks. Rather, it is argued, direction to pay is accomplished solely by a valid maker's signature.

Contrary to appellant's assertion, in appellee's view, a bank's deposit of checks to its customer's account does *not* constitute the "recredit" envisioned by this court in *Cincinnati Ins. Co., supra.* Appellee reasons that the fortuitous fact that the proceeds were deposited in the same account from which they were drawn is not a defense for the bank's honoring of the forgeries. The only rule limiting customer recovery is that the customer can not recover from its bank if there has not been a loss. In this case, Stinn has suffered forgery-related loss of several hundred thousand dollars.

Likewise, the bank's claim that Stinn breached its presenter's warranty is a *non sequitur* in appellee's opinion because the bank's customer (Stinn) never received any consideration in the transaction. Appellant's "damages" under the statute upon which it bases this claim (R.C. 1304.13[C]) "shall not exceed the [customer's] consideration received * * *

[plus finance charges and expenses]." Hence, even if its theory of liability were correct, the bank would still recover nothing.

Additionally, appellee argues that it is absurd for appellant to suggest that the UCC provides that a forger's knowledge is to be imputed to his or her employer.

One protection that is afforded banks in cases such as this, appellee admits, is the one-year limitations period of R.C. 1304.29(D) which the bank has already utilized (in the appellate court) to escape $73,000 of its liability.

Lastly, Stinn counters that appellant's belated assertion that it is not responsible for forgeries when the agent-embezzler supplies the payee's name to the employer is not dispositive of this cause for two reasons. Appellee contends that the record does not support a contention that the forger did not originally intend the named payees to have an interest. Further, the issue was not previously pursued by appellant on appeal.[2]

## II

In resolving the unfortunate dilemma presented by this case, we remain cognizant that the Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss. Ideally, the thief is held accountable. The unfortunate reality is that the loss is often shifted to the innocent party whose conduct or relationship with the forger most facilitated the risk of loss.

The reviewing court below correctly recognized that the UCC governs the contractual relationship between a bank and its customer. As pertinent to our query in this appeal, the UCC framework has been ably described by Circuit Judge Goldberg in *Perini Corp.* v. *First Natl. Bank of Habersham Cty.* (C.A. 5, 1977), 553 F. 2d 398, 403, as follows:

"Perpetuating a distinction introduced into the legal annals by Lord Mansfield in the eighteenth century, the Code accords separate treatment to forged drawer signatures (hereinafter 'forged checks') and forged indorsements. In general, the drawee bank is strictly liable to its customer drawer for payment of either a forged check or a check containing a

---

[2] Appellee further contends that appellant is impermissibly attempting to raise issues and two defenses which were not argued below. We disagree. Under the liberal notice pleading system adopted in this state, appellant's pleadings were sufficient to place Stinn on notice of appellant's defenses. For example, presentment warranties, estoppel, ratification and agency were all embraced within appellant's affirmative defenses. See Civ. R. 8(F); cf. *Border City S. & L. Assn.* v. *Moan* (1984), 15 Ohio St. 3d 65.

Additionally, since National City prevailed at the trial court level, it was not obliged to cross-appeal issues in the court of appeals raised at trial which it later chose to advance to the Supreme Court as grounds for upholding the original trial court judgment. See, generally, *Kish* v. *Central Natl. Ins. Group* (1981), 67 Ohio St. 2d 41, 51, at fn. 7 [21 O.O.3d 26]; *Parton* v. *Weilnau* (1959), 169 Ohio St. 145, 170-171 [8 O.O.2d 134]; *Duracote Corp.* v. *Goodyear Tire & Rubber Co.* (1983), 2 Ohio St. 3d 160, 163-164. Accord *Salzl* v. *Gibson Greeting Cards* (1980), 61 Ohio St. 2d 35, 38, at fn. 2 [15 O.O.3d 49].

forged indorsement. In the case of a forged indorsement, the drawee generally may pass liability back through the collection chain to the party who took from the forger and, of course, to the forger himself if available. In the case of a forged check, however, liability generally rests with the drawee. The patchwork of provisions from which this general allocation of liability emerges merits more detailed description."

Since we fully concur in this analysis, and because the rules of law both created and preserved by the UCC can not be applied in like manner to all factual settings, we will proceed in our analysis by grouping these instruments in like classifications.

*Forged Endorsement Only.* In *Cincinnati Ins. Co.* v. *First Natl. Bank, supra,* the customer issued checks payable to three payees. Although all three of the payees did not endorse the checks, the payor bank deducted the amounts from the customer's account. Upon discovery of this, the customer demanded that the funds be recredited to its account.

Justice Locher's majority opinion observed that the "checks were not 'properly payable' since they were not endorsed by one of the named payees." Accordingly, we entered judgment against the payor bank, holding in the syllabus as follows: "When a bank charges an item, which is not 'properly payable' pursuant to R.C. 1304.24, against a customer's account, the bank is required to recredit the customer's account in the amount of the item."

The Uniform Commercial Code also provides, consistent with our reasoning in *Cincinnati Ins. Co., supra,* that a check bearing a forged endorsement is not "properly payable," and if paid,[3] the bank is generally liable to its customer. See, also, White & Summers, Uniform Commercial Code (2 Ed. 1980) 658, Section 17-3; R.C. 1304.24; 1303.40 (UCC 3-404); and the discussion to follow herein. There are two exceptions to the rule that forged endorsements are ineffective. See R.C. 1303.41 (UCC 3-405) and 1303.42 (UCC 3-406). Although relief may sometimes be appropriate under R.C. 1303.42 for other instruments (see discussion *infra*), an application of R.C. 1303.41 ends our inquiry concerning *this* group of checks.

R.C. 1303.41 states in pertinent part:

"(A) An indorsement by any person in the name of a named payee is effective if:

"(1) an imposter by use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee; or

"(2) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or

---

[3] One related question is whether the in-and-out bank transactions in this case constituted final payment. We find that it was because R.C. 1304.19 provides that an item is finally paid when the bank has, *inter alia,* "* * * completed the process of posting the item to the indicated account of the drawer * * *." Although a deposit was also made to the *Stinn* account, it is beyond reasonable dispute that the account was in fact charged for the items.

"(3) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest."

This section concerns the employee who exploits his employer's trust by causing the employer to issue a check to a fictitious payee or a real person to whom an interest is *never intended* to be given.[4] The dishonest employee forges the payee's signature and the drawee bank charges the customer's account. In an action between the customer and the payor bank, the bank will prevail because the UCC view is that the employer should bear the losses (of such a forged *endorsement*) which actually results from its employment of a cheating worker. The drafters believed that employers should carefully choose and supervise persons in such sensitive positions. Further, employers are in the best position to prevent such embezzlement. See White & Summers, *supra,* at 632, Section 16-8; and cases discussed at 634. Official Comment 4 to the UCC provision explains subsection (A)(3) of the statute as follows:

"* * * It extends the rule of the original Subsection 9(3) (NIL) to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or otherwise furnishes the signing officer with the name of the payee. The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than the business of the holder or drawee."

A Kentucky court persuasively explained that "[i]t seems that the particular statutory section with which we deal is a banker's provision intended to narrow the liability of banks and broaden the responsibility of their customers. See White & Summers, Uniform Commercial Code, Sec.

---

[4] Contrary to appellee's contentions, when taken as a whole, the record amply supports a conclusion that Hajjar never intended the named payees to have an interest in the checks. For example, Edmund A. Stinn, Jr. testified as follows:

"A. One of the modus operandi of Julie on some of those checks was to, say, make a normal monthly draw check out to Lucille Huston, and instead of having one check, write two checks, and so one was valid.

"* * *

"Q. And isn't it true that every single one of those checks which she did she never [*sic*] , as to the second one she never intended for that person to get two checks?

"A. I am sure."

Testimony of appellee's office manager and handwriting expert also support a conclusion that Hajjar never intended the named payees, both fictitious and real, to receive any interest in the checks because she replaced the stolen cash with a Stinn check drawn in the exact amount of the cash removed. Since the signatures were inauthentic, it is clear that Hajjar "* * * intended the named payees, fictitious or real, to have no interest in the checks." *Perini Corp., supra,* at 409.

16-8, 549 (1972)." *General Acc. Fire & Life Assur. Corp.* v. *Citizens Fid. Bank & Trust Co.* (Ky. 1975), 519 S.W. 2d 817, 819.[5]

Such a resolution also advances the legitimate public policy goals raised in the *amici* briefs.[6] Moreover, our conclusion is consonant with this court's pre-UCC position of resting such losses with the employer. The syllabus in *Hillside Dairy Co.* v. *Cleveland Trust Co.* (1944), 142 Ohio St. 507 [27 O.O.435], so holds as follows:

"1.   Where one of two innocent parties must suffer because of a fraud or forgery, justice requires that the loss be borne by him who is first at fault and put in operation the power which resulted in the fraud or forgery.

"2.   A depositor may not recover from a depositary for loss sustained by reason of the payment of checks, each bearing a forged indorsement, when such loss is due to the negligence of the depositor *through his continued, misplaced confidence in his own faithless employee who committed the forgeries and concealed them from both the depositor and the depositary.*" (Emphasis added.)

See, also, *Armstrong* v. *Natl. Bank* (1889), 46 Ohio St. 512; 71 Ohio Jurisprudence 3d (1986), Negotiable Instruments, Section 76; 9 Ohio Jurisprudence 3d (1979), Banks, Section 236.

We therefore conclude that the position advanced by appellant in its second proposition of law has merit and that appellee has no claim under the UCC by reason of the forged endorsements contained on these instruments.

*Forged Drawer(s) Signatures.* If an instrument which bears both a forged drawer's signature and forged endorsement(s) is paid by a customer's bank, for purposes of UCC analysis, the "double forgery" is

---

[5] Appellant also argues that Stinn's rubber-stamped deposit endorsement constitutes the customer's direction to pay the check. We disagree because the direction to pay is on the front of the instrument, if at all, as evidenced by a properly completed instrument containing valid maker signature(s). Although customer endorsements may at times be legally significant (such as endorser's warranty), we do not consider them to be a pay order. In this case, Stinn's rubber-stamped endorsement is not a drawer's order to pay.

[6] Fifth Third Bank, First Community Bank and the Ohio Bankers Association argue as *amici curiae* in support of appellant National City. Essentially, they urge reversal of the court of appeals' decision which the *amici* view as contrary to the UCC's philosophy of placing the risk of loss due to the acts of a dishonest employee upon the employer. The decision below runs counter to modern demands for fast check processing and vastly expands banks' liability to unprecedented and dangerous extremes with results, they claim, that were never intended by the UCC's drafters. The *amici* advise that if the court of appeals' decision is not reversed, banks will no longer be able to safely process legitimate "wash transactions" in an expedient manner. Further, the appellate court's decision encourages employer negligence and creates new opportunities for fraud. In this instance, the *amici* caution that the embezzlement of cash caused Stinn's loss; the forgeries were merely a post-theft scheme to hide the embezzlement.

treated as if it involved a forged drawer's signature alone. *Perini Corp.* v. *First Natl. Bank of Habersham Cty., supra,* at 408-414.[7]

The settled view is that, with certain just exceptions (discussed below), the drawee bank may not charge the drawer's account because the drawer did not sign the check. If the drawee does charge the customer's account, the customer can insist on recredit under R.C. 1304.24 since the item is not properly payable. *E.g., Price* v. *Neal* (K.B. 1762), 3 Burr. 1354, 97 Eng. Rep. 871; R.C. 1304.24; 1304.19; White & Summers, *supra,* at Sections 16-1, 16-2 and 17-3. Official Comment 1 to R.C. 1303.54 consistently explains in part:

"1. The section follows the rule of *Price* v. *Neal,* 3 Burr. 1354 (1762), under which a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover back his payment. Although the original Act is silent as to payment, the common law rule has been applied to it by all but a very few jurisdictions. The traditional justification for the result is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional ra-

---

[7] The following comment by White & Summers at 617-618, Section 16-2, exemplifies the difficulties presented by such cases:

"Nowhere is this lack of clarity more obvious than in the so-called 'double forgery' cases, in which instruments bear both a forged drawer's signature and a forged indorsement. Such a case was *Perini Corp.* v. *First Natl. Bank of Habersham County, Georgia.* Because of the large volume of checks required in its business, Perini, a Boston contractor, used a facsimile signature machine to imprint its signature as drawer. A thief or thieves used the machine one night to write a series of checks on Perini's large New York banks. The thief, known in the case as 'Quisenberry,' then deposited over a million dollars worth of checks in a small Georgia bank. To add insult to injury, Quisenberry drew the checks to phony sole proprietorships ('Quisenberry Contracting'), but then in depositing them merely indorsed them with an individual signature ('Jesse Quisenberry').

"In a lyrical opinion, Judge Goldberg of the Fifth Circuit cut through the mass of 'commercial paper conundrums' to find a forged drawer's signature, *Price* v. *Neal*-type, case. Thus, under 3-418, the drawee banks in New York would have been liable to Perini for their improper payment. To facilitate using its check signing machine, however, Perini had passed a corporate resolution that authorized the drawees to accept any accurate facsimile signature, 'regardless of by whom . . . it may have been affixed.' Further, Judge Goldberg concluded that the checks were to be treated as ones without any forged indorsement at all, where, under 3-405(1)(b), the thief intended the named payees (the phony sole proprietorships) to have no interest in the checks.

"Thus, Perini was left without recourse against the drawees (because of the corporate resolution). Against the presenting and collecting banks Perini's only hope, on remand, was to argue that the depositary bank was not entitled to the protection of 3-418 since it lacked good faith.

"The final result in *Perini* seems correct. Perini and the small Georgia bank are left to slug it out on the good faith issue (with Perini claiming small banks are not supposed to hand over a million dollars in cash so quickly to someone with a taped-on mustache, and the bank claiming that Perini should have kept an armed guard on its check signing machine). Note that even under the Code, it took an able federal judge over twenty pages to resolve the conflict, because of difficulty in the application of *Price* v. *Neal* and the forged indorsement rules in the same case."

tionalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered.

"The rule as stated in the section is not limited to drawees, but applies equally to the maker of a note or to any other party who pays an instrument."

The exceptions to the policy noted above include: first, UCC presentment warranties and, second, the customer's negligence if it substantially contributed to the forgery.

The presentment warranties for negotiable instruments in general are found in R.C. 1304.13(A) and (B). However, the warranties provided by subsection (B) do not run to payor banks such as National City. See Official Comment 4 and White & Summers, *supra,* at Section 16-2. As pertinent to the cause at bar, R.C. 1304.13(A)(1) provides that the drawee bank's customer warrants on presentment that it has good title, that is, no bad endorsements. (As was explained, *supra,* the forged endorsement[s] were effective in this case.) R.C. 1304.13(A)(2) warrants that the customer has no *knowledge* that the *drawer's signature* is unauthorized. We believe that in this instance appellee presents the better-reasoned position that Stinn did not have "knowledge" of the forgery by reason that it had an employment relationship with the forger who rubber-stamped the employer's deposit endorsement as part of the overall theft scheme. Cf. R.C. 1301.01(Y). In short, the bank can not succeed on presentment warranty theories for the forged drawer checks because Stinn had no knowledge of the forgery and the checks were not properly payable. In actuality, the crux of the bank's argument does not concern a warranty breach but rather centers on what it perceives as the controlling factor in this case: appellee Stinn's contributory negligence.

National City may utilize two avenues in the UCC to raise Stinn's negligence. First, R.C. 1304.29(A) and (B) concern the customer's duty to examine cancelled items and promptly notify the bank of forgeries. (See Limitations Period section, *infra.*) The second, R.C. 1303.42, concerns the customer's negligence in allowing a forgery to occur in the first place. It provides as follows:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

As such, the "concluding clause [of this statute] * * * deprives a negligent drawee [bank] * * * of an estoppel defense." White & Summers, *supra,* at 625, Section 16-5. Similarly, R.C. 1304.29(C) states that the customer's negligence in R.C. 1304.29(A) and (B) "* * * does not apply if the customer establishes lack of ordinary care on the part of the bank in

paying the item[s]." Accordingly, both UCC provisions allow the customer to assert the bank's negligence, as a total shield, when the bank itself does not exercise ordinary care by meeting reasonable commercial standards. White & Summers, *supra*, at Sections 16-5 and 16-6. Official Comment 7 to R.C. 1303.42 explains in part:

"The section applies the same rule to negligence which contributes to a forgery or other unauthorized signature, as defined in this Act (R.C. § 1301.01). The most obvious case is that of the drawer who makes use of a signature stamp or other automatic signing device and is negligent in looking after it. The section extends, however, to cases where the party has notice that forgeries of this signature have occurred and is negligent in failing to prevent further forgeries by the same person. It extends to negligence which contributes to a forgery of the signature of another, as in the case where a check is negligently mailed to the wrong person having the same name as the payee. As in the case of alteration, no attempt is made to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case." See, also, *Gresham State Bank* v. *O & K Constr. Co.* (1962), 231 Ore. 106, 370 P. 2d 726.

Normally, Stinn could be precluded from asserting the unauthorized signature (under R.C. 1303.42) against appellant because its negligence did substantially contribute to the forgery. However, when the customer proves the drawee bank's negligence by demonstrating that it paid checks "* * * which ordinary banking standards would require it to refuse * * *," the bank is precluded from raising the customer's negligence as an estoppel. Official Comment 6 to R.C. 1303.42.

In this instance, Stinn's argument, that appellant breached the duties imposed by the UCC concerning the items containing a forged drawer's signature, has merit. The appropriateness of awarding damages in this case is examined *infra*.

*Limitations Period.* The court of appeals' construction of R.C. 1304.29(D), so as to preclude Stinn's recovery of checks with a forged drawer's signature in its possession over one year without providing requisite notice to the bank, is correct. As Official Comment 5 to R.C. 1304.29 explains:

"* * * [D]ivision (D) places an absolute time limit on the right of a customer to make claim for payment of altered or forged paper without regard to care or lack of care of either the customer or the bank. In the case of alteration or the unauthorized signature of the customer himself the absolute time limit is one year * * *. This recognizes that there is little excuse for a customer not detecting an alteration of his own check or a forgery of his own signature.* * *"

The UCC provision functions as a statute of limitations which extinguishes stale claims where the customer is not diligent in detecting and reporting forged instruments.[8]

---

[8] Additionally, the fourteen-calendar-day-notice bar of R.C. 1304.29(B)(2) is not applic-

*Damages.* Lastly, we are called upon to ascertain what remedies, if any, are available to appellee by reason of appellant's payment of those items containing a forged drawer's signature. The cardinal common-law rule of awarding damages to make the plaintiff whole for the wrong done to him by the defendant has been embodied in the Uniform Commercial Code as adopted by this state. Likewise, the basic principle of law that a party may not recover damages if he has not suffered an injury is applicable to contract breaches governed by the Act. In this regard, R.C. 1301.06(A) provides that "[t]he remedies provided by * * * [this Act] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed * * *."

When a customer's bank makes final payment on an item which is not "properly payable" pursuant to R.C. 1304.24, the appropriate remedy is for the bank "to recredit the customer's account." *Cincinnati Ins. Co., supra,* at 224. This basic concept was succinctly explained in *Ford Motor Credit Co.* v. *United Services Auto. Assn.* (N.Y. Civ. Ct. 1972), 11 UCCRS 361, a decision we cited approvingly in *Cincinnati Ins. Co., supra,* at 225, as follows: "It is axiomatic in banking relations that a bank may pay a check and debit its customer's account only as directed by the customer. * * * Failure to pay as directed renders the bank *strictly liable for any loss sustained.*" (Citations omitted; emphasis added.) *Ford Motor Credit Co., supra,* at 363.

More recently, the Supreme Court of Colorado harmonized the underlying premise of compensating the customer's loss with the "properly payable" provisions of the UCC. Citing both the New York decision in *Ford Motor Co., supra,* and our more recent decision in *Cincinnati Ins. Co., supra,* the Colorado court persuasively explained that "[i]n order to recover more than nominal damages for breach of contract a plaintiff must prove that he suffered a loss resulting from the defendant's actions. *See J. Calamari & J. Perillo, Contracts* § 14-4 (2d ed. 1977). * * * Strict liability [*per Cincinnati Ins. Co.*] in this context does not excuse the customer from establishing a causal loss; instead, the bank's liability may be established without proving fault of the bank. *See generally W. Prosser, Torts* § 75 (1971)." *Isaac* v. *American Heritiage Bank* (Colo. 1984), 675 P. 2d 742.[9] See, also, *Ohio Bell Tel. Co.* v. *BancOhio Natl. Bank* (1985), 27 Ohio App. 3d 8.

However, recrediting or compensating the customer for the face amount of the improperly paid item does not always provide the proper remedy. The framers therefore also included a governing clause in R.C.

---

able in this case because of appellant's contributory negligence, *i.e.,* "lack of ordinary care." R.C. 1304.29(C).

[9] Payment or satisfaction of instruments is also addressed in R.C 1303.69(A) which consistently states that "[t]he liability of any party is discharged to the extent of his payment or satisfaction to the holder * * *." In this regard, see, also, *Cincinnati Ins. Co., supra,* at 224, fn. 7.

1301.06(A) which provides that "* * * neither consequential or special nor penal damages may be had except as specifically provided in * * * [this Act] or by other rule of law."[10]

One such specific provision of the Act is set forth in R.C. 1304.03(E). As we recognized in *Cincinnati Ins. Co., supra,* at 225, this statute establishes a mechanism to measure damages in "a negligence-type action" when the bank has breached its contract by failing to exercise "ordinary care" in handling an item. R.C. 1304.03(E) states that "[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence." In *Whalen & Sons Grain Co.* v. *Mo. Delta Bank* (E.D. Mo. 1980), 496 F. Supp. 211, 215, a federal court explained in part that claims for "consequential damages" under this specific code provision "are recoverable only on a showing of bad faith." See, also, *Perini Corp., supra,* at 420.

Moreover, consequential damages for breach of contract, in addition to the statutory "bad faith" provision, noted above, have long been subject to the rule of law that a plaintiff is only "entitled to recover such damages as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract * * *." *Devereux* v. *Buckley & Co.* (1877), 34 Ohio St. 16, 21, adopting the rule laid down in the leading English case of *Hadley* v. *Baxendale* (1854), 9 Exch. 341, 156 Eng. Rep. 145.[11]

In the case at bar, any direct loss would have had to occur when the bank improperly paid the forged items. Consequential damages, if any, concern the loss resulting from the embezzlement of cash from the money box.[12] Appellee, of course, can make no legitimate claim for those funds

---

[10] Additionally, R.C. 1301.03 codifies the continued applicability of all supplemental bodies of law not explicitly displaced by the Act, as follows: "Unless displaced by the particular provisions of Chapters 1301, 1302, 1303, 1304, 1305, 1306, 1307, 1308, and 1309 of the Revised Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

[11] See, generally, 5 Hawkland & Lawrence, Uniform Commercial Code Series (1984) 216-219, Section 4-103:10.

[12] The following examples are offered to illustrate this point. First, consider a bookkeeper in need of funds who steals a $10 bill from his employer's cash register. In need of more money, the same worker also cashes a $10 check, drawn on the employer's bank account, which is not properly payable and pockets these proceeds as well. The employer has lost $20 but, assuming *arguendo* that the bank is liable for the amount of the improperly paid item, only $10 of the loss could ever be viewed as damages directly attributable to the "improperly payable" banking transaction.

Next, consider the same scenario except that after cashing the check the thief confesses to his employer and returns the $10 paid by the bank, or, as in this case, replaces the $10 bill

which were actually withdrawn as a result of the bank's in-and-out transaction which ended with the funds safely redeposited in Stinn's account. Whether couched as a "wash" transaction, *Pupko* v. *Bank of America* (1981), 114 Cal. App. 3d 495, 170 Cal. Rptr. 615, or as being barred by the doctrine of unjust enrichment,[13] *Isaac, supra,* at 746, the courts are legion in their judgment that a customer has no legitimate claim for damages nor to having its account recredited for items improperly paid when the very funds were in fact later redeposited or otherwise recovered by the customer.[14] *Wiest* v. *First Citizens Natl. Bank* (Pa. C.P. 1966), 10 Lyc. 125, 3 UCCRS 875[15]; cf. *Clemens* v. *First Natl. Bank of Berryville* (1985),

---

taken from the till with a forged check drawn on the employer's account which is destined to be deposited in the employer's checking account in the hope that the stolen cash will not be missed; to wit, the daily receipts register will match the bank deposit ticket. The employer has still lost the original $10 bill taken from the till but did not lose an additional $10 because the proceeds of the check were not pocketed by the thief. They were, in fact, returned or retained by the employer.

In this case, payment and deposit of the checks were not the direct causes of appellee's loss. That loss was the result of manipulations with regard to appellee's cash box, over which appellant had no control. Cf. *Davis Aircraft Prod. Co.* v. *Bankers Trust Co.* (1971), 36 App. Div. 2d 705, 319 N.Y. Supp. 2d 379, 380. As is explained more thoroughly in the text of our opinion, any damage claim against the bank (by the employer in the second hypothetical above) for the $10 taken from the cash register is one for consequential damages essentially based on a theory that the theft of cash would have been thwarted if the bank had not negligently breached its contract. Unlike the basis of recovery applied by us in *Cincinnati Ins. Co., supra,* the instant bank is not strictly liable for customer losses stemming from internal embezzlement of cash. Rather, its responsibility, if any, is governed by other UCC provisions as augmented by the law of this state, relative to negligent breaches of contract.

[13] "In our judgment unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Hummel* v. *Hummel* (1938), 133 Ohio St. 520, 528.

[14] "In *Cooper* v. *Stock Yards Bank of Oklahoma City,* 644 P. 2d 123 (Okl. App. 1981), a bookkeeper, without proper authorization, signed checks on the company account to pay company creditors. The owner of the company, the customer of the bank, brought suit to recover the amount of all the checks signed by the bookkeeper. The Oklahoma court denied recovery, holding that the customer had failed to prove that he was damaged by the wrongful payment of the checks. 'It is elementary that a party may not recover for a breach of duty unless he also proves he was damaged by the breach.' *Id.* at 125. The court emphasized that the bank had offered uncontroverted evidence that all checks signed by the bookkeeper went to pay legitimate debts of the company." *Isaac, supra,* at 746.

[15] Interestingly, appellant draws our attention to a Pennsylvania case which could have served as a pattern for Hajjar's scheme in this instance. In *Wiest* v. *First Citizens Natl. Bank, supra,* a dishonest bookkeeper stole cash from her employer and later shielded the embezzlement by forging a check drawn on the employer's inactive bank account and then depositing it into the boss' active account. As in this case, office records were dummied by the worker to coincide with the deposits. Upon discovery of the forgery, the employer (customer) demanded that the bank credit his inactive account for the amount of the forged check deposited in his active account. He reasoned that the item was not properly payable. Holding in favor of the bank, the *Wiest* court sensibly stated at 127-128, 3 UCCRS at 877: "The funds transferred by the embezzling employee from the plaintiff's inactive bank account to the active office bank account were not removed from the dominion and control of

286 Ark. 290, 692 S.W. 2d 222; *Neo-Tech Systems* v. *Provident Bank* (1974), 43 Ohio Misc. 31, 40-41 [72 O.O.2d 329][16]; *Gibbs* v. *Gerberich* (1964), 1 Ohio App. 2d 93 [30 O.O.2d 113]. This premise is little more than an application of the settled proposition that in an action on a negotiable instrument, payment is an affirmative defense. .The Official Comment to R.C. 1304.03(E) explains: "* * * Of course, * * * as it has been under ordinary common law principles that, before the damage rule of the division becomes operative, liability of the bank *and some loss* to the customer or owner must be established." (Emphasis added). Cf. *Ohio Bell Tel. Co., supra,* at 9-10.

In this case, the loss occurred when Stinn's own clerk stole the cash from the company till. The forgery scheme was but a coverup to conceal the underlying theft. Although the bank was initially responsible to Stinn for paying certain of the items containing a forged drawer's signature, this liability was extinguished to the extent that the improperly withdrawn funds were redeposited. *If* improperly payable checks had been cashed by the clerk, Stinn would have suffered twice the loss; that is, the funds taken from the till and the unrecovered funds withdrawn by the check forgery. Under the previous UCC discussion above, a portion of the latter would be the bank's responsibility. However, in actuality there was no direct loss occasioned by the processing of the banking transactions which were but a ruse for the real theft.

Therefore, Stinn's remedy against its bank, if any, does not concern recredit of its account pursuant to R.C. 1304.24 and *Cincinnati Ins. Co., supra.* To reiterate, this is because a party has no right to such damages from the bank when the money actually reached the party (in this case by redeposit) although not in the manner expected. Cf. *Clemens, supra,* at 225. Stinn's actual claim is that it "sustained consequent [*sic*] damage as a result of the [b]ank's honoring of a forged check." As such, appellee is actually seeking to recover the funds taken from its cash box by its employee which Stinn claims could not have been stolen if the bank had exercised ordinary care in handling the forged checks which were used to cover up the theft. Pursuant to the foregoing discussion, we find that "[t]his is arguably a consequential damage, subject to the bad faith standard of * * * [R.C. 1304.03(E)] or, if the latter does not apply, the old common law rule of *Hadley* v. *Baxendale,* 156 Eng. Rep. 145 (1854), which limits defendant's liability for breach of contract to those damages within the contemplation of the parties when the contract was made. *See, e.g., Evra Corp.* [v. *Swiss Bank Corp.* (C.A. 7, 1982)], *supra,* 673 F. 2d [951] at

the plaintiff. Certainly it would be illogical to adjudge that the plaintiff is entitled to recover monies which he has received and which he has either retained or used."

[16] In *Neo-Tech Systems, Inc., supra,* at 40, the court remarked, *inter alia,* that even though the bank negligently paid checks lacking a second corporate drawer's signature, "[i]f * * * it is shown that the funds from the controverted checks were used to pay valid debts of the * * * [plaintiff-drawer], the plaintiff suffered no damage, whether it be in theory of unjust enrichment, estoppel, subrogation, or other common law defense."

955-56; *Spang Industries* v. *Aetna Casualty & Surety Co.*, 512 F. 2d 365, 368 (2d Cir. 1975) [and *Devereux, supra*]." *Bar-Ram Irrig. Products* v. *Phenix-Girard Bank* (C.A. 11, 1986), 779 F. 2d 1501, 1505. As in *Bar-Ram*, the trial court herein "made no findings on the question of whether the damages alleged by appellees were direct or consequential, or, if the latter, whether bad faith or *Hadley*'s 'special circumstances' were involved." *Id.* Thus, based on the record before us, we are unable to compute an award in this cause or even ascertain with complete certainty the appropriateness of awarding consequential damages. See *Perini Corp., supra,* at 420. We therefore must remand the cause to the trial court for fuller consideration.

*Conclusion.* In summary, if little else our whirlwind ride aboard the UCC merry-go-round has demonstrated that application of even the most carefully crafted commerical code statutes can be a difficult undertaking.[17] In the case *sub judice*, the court of appeals correctly held that Stinn's claim, if any, was extinguished for those forged checks held in its possession for over one year without providing statutory notice to the bank. R.C. 1304.29(D). Likewise, Stinn has no right of recovery for those instruments containing only Hajjar's forged endorsement. This is because such endorsements are deemed effective under R.C. 1303.41 since the loss was due to the negligence of Stinn through its misplaced confidence in its own faithless employee. However, by failing to exercise the requisite standard of ordinary care in the payment of checks containing a forged drawer signature, National City is precluded from raising its customer's negligence as an estoppel. Nevertheless, recredit of the customer's account is not called for because Stinn's loss was from the theft of cash by a dishonest employee and not directly from the bank's final payments of the forged instruments.

Therefore, the ultimate determination of whether any consequential damages are appropriate rests on Stinn's ability to demonstrate on remand that the bank's payment of checks containing a forged drawer's signature was made in "bad faith" or that such damages were within the contemplation of the contracting parties consistent with the rule of law first recognized in *Hadley* v. *Baxendale, supra.*

Accordingly, the judgment of the court of appeals is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

CELEBREZZE, C.J., SWEENEY, LOCHER and C. BROWN, JJ., concur.

---

[17] We believe that, as in *Perini Corp., supra,* "[t]his case illustrates the unwisdom of the belief that codification provides the yellow brick road to judicial certainty. Unimaginable circumstantial concatenations and scientific innovation very often outrun the fixity of a codified consensus. Such is emphatically the situation this court faces today." *Id.* at 402.

HOLMES and WRIGHT, JJ., concur in judgment, with opinion.

DOUGLAS, J., concurs in judgment only.

HOLMES, J., concurring in judgment. While I am in agreement with several conclusions reached in the majority opinion, as well as the judgment which reverses the judgment of the court of appeals, I cannot accept a number of the majority's views or findings as to the bank's practices at issue, application of the UCC to the facts of this case, or application of common law to the UCC.

I fully agree that R.C. 1303.41(A)(2) precludes appellee from asserting any claim based on forged endorsements contained in those instruments. It seems apparent that the employee never intended the named payee to have an interest in the instrument and that these check endorsements had been forged by the dishonest employee who signed "as or on behalf of a maker or drawer." Also, there is little dispute that appellee can make no claim for funds which were merely transferred to another of appellee's accounts, since payment is an affirmative defense. See R.C. 1304.03(E) and its Official Comment. Unfortunately, what is given with one hand is taken away by the other.

R.C. 1304.29 states:

"(A) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries * * *, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

"(B) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by division (A) of this section, the customer is precluded from asserting against the bank:

"(1) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

"(2) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was [sic] available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"(C) The preclusion under division (B) of this section does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item."

As a matter of law, appellant has established that appellee failed to detect the unauthorized signatures. The issue thus narrows to whether the appellant failed to exercise "ordinary care * * * in paying the item." This is the primary issue in the case before us.

The majority found that appellant "breached the duties imposed by the

UCC'' and that appellee effectively had shown "the drawee bank's negligence by demonstrating that it paid checks '* * * which ordinary banking standards would require it to refuse * * *.' '' Accordingly, it is asserted that the "bank is precluded from raising the customer's negligence as an estoppel." The majority would then allow appellee to receive damages from appellant under the rubric of consequential damages of R.C. 1304.03(E) or " 'the old common law rule of *Hadley* v. *Baxendale,* 156 Eng. Rep. 145 (1854).' '' By such reasoning, the majority has missed the major point of this appeal.

Even a cursory glance at the various *amici* briefs reveals that this case calls into question a widespread banking practice which is done out of necessity to comply with federal and state regulations requiring deposits to be processed by midnight of the date of deposit. *Amicus* brief of Ohio Bankers Association, at 4. Banks ordinarily verify the authorized signature on any instrument which requires a transfer either of cash or electronic funds to an entity different from the drafter. Even when the drafter and payee are the same person, the bank checks the signature whenever the instrument directs that cash be paid across the counter.

However, when the drafter and recipient are the same entity, and the instrument requires only that electronic funds be moved from one account owned by the entity to another account owned by the same entity, then banks customarily do not check the signatures. The reason is obviously that no one receives any of the depositor's money from the bank and there is no risk to anyone's funds, as in the case here.

It must now be determined whether the bank's above practice violated the standard of ordinary care required by R.C. 1304.29(C). Ordinary care is expressly defined in such circumstances by R.C. 1304.03(C) which states in pertinent part: "* * * action or non-action consistent with clearing house rules and the like or with a *general banking usage* * * * prima facie constitutes the exercise of ordinary care." (Emphasis added.) The Official Comment to that section states, in pertinent part:

"The term 'general banking usage' is not defined but should be taken to mean a general usage common to banks in the area concerned. See R.C. § 1301.11(B) [UCC 1-205(2)]. Where the adjective 'general' is used, the intention is to require a usage broader than a mere practice between two or three banks but it is not intended to require anything as broad as a country-wide usage. A usage followed generally throughout a state, a substantial portion of a state, a metropolitan area or the like would certainly be sufficient. Consistently with the principle of R.C. § 1301.11(C) [UCC 1-205(3)], action or non-action consistent with clearing house rules or the like or with such banking usages prima facie constitutes the exercise of ordinary care."

Because the practice at issue is nearly a universal practice among banking institutions, there is no disputing that the UCC considers it an

exercise of ordinary care, more so when the practice is necessary for conformance with federal reserve regulations, as here.

Great confusion could result from the indiscriminate and mistaken use of the term "negligence" in the context of the statutes here at issue. This the majority fails to realize. As pointed out above, the standard of ordinary care is a separate and distinct UCC concept, especially in R.C. 1304.01 *et seq.*, where the term is expressly linked to federal reserve regulations, operating letters, clearing house rules and, of course, general banking usages. See R.C. 1304.03(C) and Official Comments 3 and 4. Any action involving such transactions must utilize this section's ordinary care standard, which differs markedly from the law of negligence.

Because the standard of ordinary care was not violated, R.C. 1304.29(C) is inapplicable. Also, as previously shown, appellant did not "pay * * * the item" but merely transferred electronic funds among appellee's accounts. Therefore, under subsections (A) and (B), appellee's failure to exercise "reasonable care," as defined therein, precludes appellee from asserting against the bank that measure of ordinary damages set forth in R.C. 1304.03(E).

It has also been asserted that R.C. 1304.03(E) would allow appellee to receive consequential damages. The relied-upon text states: "[a]nd where there is bad faith * * * [the measure of damages] includes other damages, if any, suffered by the party as a proximate consequence." Since a finding of *bad faith* is prerequisite to such award, it becomes most obvious that appellee cannot possibly prove consequential damages. The first reason is that no basis exists upon which to predicate consequential damages because appellant exercised ordinary care in the transactions. Secondly, there was not, nor could there have been under the facts before us, any assertion that bad faith entered into appellant's concerns during the course of the disputed transactions. It is noteworthy that nowhere does appellee allege that the processing of appellee's checks by appellant was anything other than in the customary manner. This same analysis is applicable to the majority's resort to the common-law rule of *Hadley* v. *Baxendale, supra,* with the addition that such rules are entirely subject to the UCC definitions and provisions for damages.

Accordingly, I would also reverse the judgment of the court of appeals and therefore I concur in the judgment.

WRIGHT, J., concurs in the foregoing opinion.