OPINION
{¶ 1} First American Title Insurance Company of New York ("First American") appeals from a judgment of the Montgomery County Court of Common Pleas, which granted the third motion of Fifth Third Bank, Western Ohio ("Fifth Third"), for summary judgment.
 {¶ 2} The factual circumstances giving rise to this litigation were set forth in Olympic Title Ins. Co. v. FifthThird Bank, Montgomery App. Nos. 19319 and 19324, 2002-Ohio-5826 ("Olympic I"), and we repeat them herein:
 {¶ 3} "In 1995, County Corp. Development (County Corp.) made a commercial loan secured by property located on Wilmington Pike in Montgomery County. The loan, note, mortgage and all other pertinent documents from that transaction were assigned to the United States Small Business Administration (SBA).
 {¶ 4} "In 1999, LNP Investments, Inc. (LNP) borrowed $550,000 from Union Savings Bank in order to refinance the Wilmington Pike property. A portion of the monies loaned by Union Savings Bank was to be used to pay off the existing mortgage on the property held by the SBA, in the amount of $427,074.51. Union Savings Bank purchased a policy of title insurance on the property from Olympic Title Insurance Company (Olympic). Pursuant to an outstanding reinsurance treaty, part of the liability insured by Olympic was reinsured by First American.
 {¶ 5} "The closing on the refinancing was held at the offices of Dayton Title Agency, Inc. At the closing, Dayton Title gave a [payoff] check for $427,074.51 made payable to County Corp.[1] to LNP's representative, Krishan Chari. [The check was drawn on Dayton Title's account with National City Bank.] Chari typed an endorsement on the back of the check that read `County Corp. Development pay to the order of Chari Group, Ltd.' Chari then hand-wrote, `The Chari Group, Ltd. by Krishan M. Chari' beneath the typed endorsement. After endorsing the check, Chari presented it to his bank, Fifth Third Bank of Western Ohio (Fifth Third), for deposit in his account. Later, Chari removed the funds from the account.
 {¶ 6} "Because of Chari's actions, the SBA mortgage was not paid, and the SBA retained its first mortgage position on the property. Therefore, Union Savings made a claim under the title insurance policy issued by Olympic, in order to pay off the prior mortgage and obtain the first and best mortgage position on the property. Olympic paid $125,000 on the claim and sought reimbursement from First American. First American claims that it paid $264,680 toward satisfaction of the first mortgage. In exchange for the payment, the SBA made the following assignment of rights to First American:
 {¶ 7} "`FOR VALUE RECEIVED, the undersigned hereby assigns to FIRST AMERICAN TITLE INSURANCE COMPANY * * * AND OLYMPIC TITLE INSURANCE COMPANY * * * all its right, title and interest in and to a certain mortgage, together with the indebtedness secured thereby, given * * * to COUNTY CORP. DEVELOPMENT, dated the 26th day of May, 1995 * * * and subsequently assigned to the UNITED STATES SMALL BUSINESS ADMINISTRATION.'
 {¶ 8} "Olympic filed suit against Fifth Third. The complaint raised claims for conversion and negligence. First American moved to intervene as a plaintiff, and asserted claims for conversion, negligence and negligent business practices. Fifth Third filed a motion for summary judgment on all claims, which was initially denied by the trial court.
 {¶ 9} "Following additional discovery, Fifth Third filed a second motion for summary judgment. This motion was granted. In rendering summary judgment, the trial court found that County Corp. did not assign any rights to the payoff check when it assigned the loan to the SBA, so that the SBA could not assign any rights to the payoff check to Olympic or First American. The trial court, therefore, found that neither Olympic [n]or First American had standing to bring negligence claims against Fifth Third. The trial court further found that neither Olympic or First American could pursue claims for conversion against Fifth Third." Id. at ¶ 3-9 (footnote in original).
 {¶ 10} First American appealed from the trial court's decision.[2] In Olympic I, we reversed the trial court's ruling that First American lacked standing to pursue its negligence claims. We held that the assignment to First American included an assignment of any rights to the payoff check. We affirmed the trial court's ruling that First American lacked standing to pursue its conversion claim, reasoning that under R.C. 1303.60, "a payee of an instrument has a cause of action for a conversion only if the instrument has actually been delivered to the payee or its agent." Because Dayton Title had never given the check to SBA or to County Corp., the check had never been delivered to the payee and, thus, First American had no cause of action under the statute. We further noted that because R.C.1303.60 applied, First American could not pursue a common law conversion claim. On December 6, 2002, we declined to reconsider that decision. Fifth Third appealed to the Supreme Court of Ohio, which declined jurisdiction. Olympic Title Ins. Co. v. FifthThird Bank, W. Ohio, 98 Ohio St.3d 1489, 2003-Ohio-1189,785 N.E.2d 472.
 {¶ 11} Upon remand to the trial court, Fifth Third filed a third motion for summary judgment, arguing that First American's common law negligence claims were displaced by the Ohio Uniform Commercial Code ("UCC") and, thus, were not viable. First American opposed the motion. On August 28, 2003, the trial court sustained Fifth Third's motion. The court held that Olympic I
addressed only the issue of standing and did not address the merits of First American's negligence claims. Addressing the merits of those claims, the trial court stated:
 {¶ 12} "R.C. § 1303.44(D) (UCC 3-404) provides the remedies available for the breach of ordinary care when accepting an instrument from an imposter and that breach results in a loss. Division (D) recognizes that the person who suffers the loss may seek to recover the loss. The remedy that First [American] is seeking appears to be for a breach of the duty to exercise ordinary care. R.C. § 1303.44(D) appears to control, identifying the claim and the claimant.
 {¶ 13} "The UCC specifically identifies the claim and claimant for a breach of the duty to exercise ordinary care, and this Court finds that the common law claims of negligence and negligent business practices appear to be substantively similar to those provisions in the UCC. Therefore, the common law claim has been supplanted by the UCC. First [American's] common law claims are therefore excluded statutorily and by authoritative case law, specifically Amzee [Corporation v. ComericaBank-Midwest, Franklin App. No. 01AP-465, 2002-Ohio-3084]." Id. (footnote omitted).
 {¶ 14} First American appeals from that ruling, raising two assignments of error, which we address in reverse order.
"The trial court erred in finding that the law of the case does not apply to bar appellee's third motion for summary judgment."
 {¶ 15} In its second assignment of error, First American claims that Fifth Third raised the merits of the negligence claims in its second motion for summary judgment, and that "[t]he trial court specifically recognized [Fifth Third's] common law duty of care in its March 27, 2002 decision. [Fifth Third] did not dispute such duty of care at the trial court level. * * * [Fifth Third] was aware of the trial court's acknowledgment of its common law duty. [It] fully briefed and argued the UCC issue with this Court in the previous appeal and in [its] appeal for jurisdiction to the Ohio Supreme Court. The record supports that this Court had authority to decide the UCC issue since the merits of the negligence claim were before the trial court." Fifth Third responds that it raised its displacement argument for the first time in its motion for reconsideration of Olympic I. The bank notes that we declined to address that issue. It argues that there is no basis to conclude that we have previously addressed that issue.
 {¶ 16} In Nolan v. Nolan (1984), 11 Ohio St.3d 1,462 N.E.2d 410, the Supreme Court of Ohio explained the law of the case doctrine:
 {¶ 17} "[T]he doctrine provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. * * *
 {¶ 18} "[T]he doctrine functions to compel trial courts to follow the mandates of reviewing courts. Thus, where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law." 11 Ohio St.3d at 3
(citations omitted).
 {¶ 19} This doctrine has been extended "to encompass a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same case." Poluse v. Youngstown
(1999), 135 Ohio App. 3d 720, 725, 735 N.E.2d 505. However, the doctrine "should not be taken to imply that a trial court can never, under any circumstances, reconsider its prior ruling." Id. (quoting Clymer v. Clymer, (Sept. 26, 1995), Franklin App. No. 95APF02-239). Specifically, it does not preclude a court from reconsidering its prior rulings in order to correct its own errors. See id.; State ex rel. Dannaher v. Crawford,78 Ohio St.3d 391, 1997-Ohio-72, 678 N.E.2d 549 (law of the case doctrine, as expressed in Clymer, does not preclude a common pleas judge from reconsidering an interlocutory order entered in the same case by a different judge); see also Weaver v. MotorsMut. Ins. Co. (1990), 68 Ohio App.3d, 547, 548, 589 N.E.2d 101.
 {¶ 20} Upon review of the record, we find no basis to conclude that the trial court was bound by an appellate ruling regarding the merits of First American's negligence claims. InOlympic I, our discussion of First American's negligence claims was limited to whether it had standing to assert those claims. Addressing the first and third assignments of error, we held that the assignments from County Corp. to SBA and from SBA to First American included the assignment of the right to the payoff check. We did not rule on the merits of the negligence claims at that time, and we refused to address them upon Fifth Third's motion for reconsideration. Because the supreme court declined jurisdiction, it likewise did not address the viability of First American's negligence claims in light of the UCC. Accordingly, the trial court did not err in concluding that the issue remained unaddressed by the appellate courts.
 {¶ 21} First American argues that Fifth Third recognized a duty of care in its second motion for summary judgment and that the trial court likewise recognized it when addressing that motion. In its second motion, Fifth Third stated that it did not dispute "that it owes a duty to exercise reasonable care in negotiating checks." However, it emphasized that it did not owe such a duty to First American, and it did not focus on the viability of common law negligence claims. Even if the trial court had recognized such claims in granting Fifth Third's second motion for summary judgment, the trial court was not precluded from reconsidering that determination when addressing the third motion for summary judgment. Accordingly, we find no fault with the trial court's consideration of the merits of First American's negligence claims when ruling upon Fifth Third's third summary judgment motion.
 {¶ 22} The second assignment of error is overruled.
 {¶ 23} "The trial court erred in finding that the uniform commercial code supplants appellant's common law negligence claims under articles 3 and 4 of the UCC."
 {¶ 24} In its first assignment of error, First American claims that the trial court erred in concluding that its negligence claims had been supplanted by the UCC. First American maintains that common law remedies are not precluded by the UCC and may supplement the statutory remedies. It further argues that R.C. 1303.44(D), "the imposter rule," is inapplicable, and that the trial court improperly concluded that that provision precluded First American's negligence claims. In addition, First American argues that its negligence claims are consistent with the policy considerations set forth in the UCC.
 {¶ 25} Fifth Third responds that the UCC sets forth a comprehensive loss allocation scheme and that common law claims are supplanted by the statute. It contends that First American's negligence claims are precluded by the UCC, even though the UCC does not provide a remedy for First American. Fifth Third and First American dispute whether the trial court properly relied upon Amzee, supra. Fifth Third does not refute First American's contention that the trial court mistakenly relied upon the imposter rule.
 {¶ 26} "[T]he Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss. Ideally, the thief is held accountable. The unfortunate reality is that the loss is often shifted to the innocent party whose conduct or relationship with the forger most facilitated the risk of loss."Ed Stinn Chevrolet, Inc. v. National City Bank (1986),28 Ohio St.3d 221, 226, 503 N.E.2d 524.
 {¶ 27} Under R.C. 1304.30 (UCC 4-401), a bank may not charge against the account of a customer unless the item is properly payable from that account. "In general, the drawee bank is strictly liable to its customer drawer for payment of either a forged check or a check containing a forged indorsement. In the case of a forged indorsement, the drawee generally may pass liability back through the collection chain to the party who took from the forger and, of course, to the forger himself if available." Ed Stinn Chevrolet, Inc., 28 Ohio St.3d at 226-227. In other words, when a check bearing a fraudulent indorsement is involved, the general rule is that the depositary bank bears the risk of loss when the check is paid.
 {¶ 28} In certain circumstances, however, the UCC provides exceptions to this general rule and places the risk of loss upon the drawer rather than the drawee. Under R.C. 1303.44,[3]
"[i]f a check payable to an imposter, fictitious payee, or payee not intended to have an interest in the check is paid, the effect of subsections (a) and (b) is to place the loss on the drawer of the check rather than on the drawee or the Depositary Bank that took the check for collection. * * * The drawer is in the best position to avoid the fraud and thus should take the loss." 1990 Official Comment 3 to R.C. 1303.44. However, "in some cases the person taking the check might have detected the fraud and thus have prevented the loss by the exercise of ordinary care. In those cases, if that person failed to exercise ordinary care, it is reasonable that that person bear loss to the extent the failure contributed to the loss. Section (d) is intended to reach that result." Id.
 {¶ 29} The trial court concluded that R.C. 1303.44 controls in this case. That determination is incorrect. The payoff check was not drawn by or initially payable to an imposter; no forged check was involved. County Corp. was not a fictitious payee and Dayton Title intended that County Corp. have an interest in the check. Accordingly, the circumstances do not fall within R.C.1303.44(A) or (B). Because R.C. 1303.44(A) and (B) are inapplicable, R.C. 1303.44(D) is necessarily inapposite. Moreover, we note that the fraudulent indorsement was not written by an employee of the issuer or the payee, and thus does not fall within R.C. 1303.47 (UCC 3-405), which addresses fraudulent indorsements by employees.
 {¶ 30} Because R.C. 1303.44 is inapplicable, we turn to whether First American may proceed with its negligence claims against Fifth Third under either the common law or the UCC. R.C.1301.03 (UCC 1-103) provides: "Unless displaced by the particular provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code, the principals [sic] of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and or other validating or invalidating cause shall supplement their provisions." Thus, the plain language of the statute permits common law principles to supplement the statutory scheme. As recognized by the Supreme Court of Ohio, "[a]lthough R.C. Chapter 1305 is the primary source of law governing LCs [letters of credit] in Ohio, * * * [i]t is intended to be supplemented by various principles of law and equity that will often apply to help determine those rights and obligations." Mid-America Tire,Inc. v. PTZ Trading Ltd., 95 Ohio St.3d 367, 381,2002-Ohio-2427, 768 N.E.2d 619, citing R.C. 1301.03; see also Hall, Common law negligence and check fraud loss allocation: has common law supplemented or supplanted the UCC? (1990), 51 Ohio St.L.J. 605 (discussing the use of common law claims to supplement the statutory claims under the prior version of the UCC). Moreover, although comprehensive, the statutory provisions cannot predict and address every possible factual dispute regarding negotiable instruments. Accordingly, we are unwilling to conclude that the UCC supplants all common law causes of action.
 {¶ 31} However, we agree with Amzee to the extent that it concludes that parties may not "rely on a common law action to avoid the clear mandates of the UCC." Amzee, supra, at ¶ 10. Because R.C. 1301.03 permits the use of common law principles only when they are not "displaced" by the UCC, we conclude that the UCC provides the exclusive remedy where the dispute is governed by its statutory provisions. Common law causes of action may not be raised to circumvent the UCC's rights, claims, and defenses where the statute applies.
 {¶ 32} In the present case, the factual circumstances are contemplated by R.C. 1303.60 (UCC 3-420), which governs conversion of an instrument. Under that statute, an instrument is converted "if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or if a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." As we stated in Olympic I, "a payee of an instrument has a cause of action for a conversion only if the instrument has actually been delivered to the payee or its agent." Id. at ¶ 28. We recognized that, until delivery, a payee has no interest in the check and never became a holder of the check. In our judgment, to permit First American, a payee who did not receive delivery of the check, to pursue negligence claims against the depositary bank based on its allegedly wrongful payment of the payoff check would circumvent the UCC's statutory scheme which expressly addresses these factual circumstances and forecloses a claim by the payee.
 {¶ 33} First American asserts that it may affirmatively raise a negligence claim under R.C. 1303.49 (UCC 3-406), which provides:
 {¶ 34} "(A) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
 {¶ 35} "(B) Under division (A) of this section, if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded under division (A) of this section from asserting an alteration or forgery and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
 {¶ 36} "(C) Under division (A) of this section, the burden of proving that a failure to exercise ordinary care contributed to an alteration of an instrument or to the making of a forged signature on an instrument is on the person asserting the preclusion. Under division (B) of this section, the burden of proving that a failure to exercise ordinary care in paying or taking an instrument substantially contributed to loss is on the person precluded." R.C. 1303.49.
 {¶ 37} As explained in the 1990 Official Comment to that provision, "Section 3-406 adopts the doctrine of Young v.Grote, 4 Bing. 253 (1827), which held that a drawer who so negligently draws an instrument as to facilitate its material alteration is liable to a drawee who pays the altered instrument in good faith." R.C. 1303.49(B) is a comparative negligence statute, which allocates the loss among persons who substantially contributed to the loss by failing to exercise ordinary care. "If the person precluded under subsection (a) [often the customer] proves that the person asserting the preclusion [often the bank] failed to exercise ordinary care and that failure substantially contributed to the loss, the loss may be allocated between the two parties on a comparative negligence basis." Id.
 {¶ 38} First American notes that numerous courts and commentators have interpreted UCC 3-406 as providing not only a defense to liability but an affirmative claim for negligence. As stated in White Summers, Uniform Commercial Code § 19-3(d) (4th ed. 1995):
 {¶ 39} "As we have indicated above, 3-406 and the accompanying sections carry with them something that did not exist under the old Code, namely, a new cause of action. In our hypothetical case, assume that the bank paid the checks over the forged indorsement of the embezzling employee. Assume also that the employer-depositor acknowledges that it substantially contributed to the forgeries, yet asserts that some part of the loss should be borne by the bank. How does the employer-depositor recover that portion from the bank? Because it has admitted that it is precluded under 3-406(a), depositor does not have a claim against its bank for wrongful payment under 4-401. Yet there must be some mechanism by which a portion of the loss is cast on the bank. This mechanism is an affirmative cause of action for negligence under 3-406(b) (and similar causes of action under 3-404 [imposters], 3-405 [fraudulent indorsement by employee] and 3-406 [negligence contributing to forged signature]) under which the depositor-employer recovers a part of its loss by affirmative proof that the negligent behavior of the defendant bank caused a portion of it. Because 3-404(d) and 3-405(b) state that the party bearing the loss `may recover' from the other negligent party, they create an affirmative cause of action more clearly than 3-406(b) which states only that the loss `is allocated' among the negligent parties."
 {¶ 40} Although 3-406 may provide a cause of action for negligence under certain circumstances, we conclude that First American cannot avail itself of this provision. Although Fifth Third arguably might have failed to exercise ordinary care in paying or taking the payoff check, substantially contributing to the loss, First American had no interest in the check as a payee who had not received delivery of the check (nor would County Corp. or SBA have had an interest in the check, absent the assignments to First American). Accordingly, First American did not suffer a loss within the meaning of R.C. 1303.49.
 {¶ 41} Travelers Indemnity Co. v. Good (N.J.Super.Ct. 1999), 737 A.2d 690, upon which First American has relied, does not support First American's position. In Good, the bookkeeper for a law firm forged the authorized signature on eight checks, drawn from the firm's trust account. PNC Bank paid the checks from the trust account. The insurance company compensated the firm for the loss and was subrogated to the rights of the law firm. Thus, the insurance company stood in the shoes of the bank customer in its lawsuit against the payor bank for wrongfully paying the forged checks. Such claims are permitted by the UCC. In contrast to the insurance company in Good, First American has asserted its claims as the subrogee of the payee who did not receive delivery. Such claims are precluded by R.C. 1303.60.
 {¶ 42} Moreover, we disagree with First American that our decision in Third Nat'l Bank Trust Co. v. Diamond Savings Loan Co. (1987), 43 Ohio App.3d 140, 540 N.E.2d 272, imposes a duty of care on a bank in favor of a payee to reasonably investigate potentially fraudulent checks. In that case, First Federal had initiated a foreclosure action in Montgomery County and had hired Richard L. Cohodes, a Columbus attorney, as its local counsel. After a sheriff's sale of the subject property, Cohodes received a check from the sheriff's department. He indorsed the check by hand and delivered the check to Diamond to be deposited in his account. Diamond indorsed the check and delivered it to Bank One, which transmitted it to Third National, the payor bank. First Federal ultimately discovered the fraud and a new check was issued by the sheriff's department. Third National brought suit against Diamond and Bank One, claiming breach of transfer warranties. In response, Diamond sued First Federal, claiming that First Federal had ratified the fraudulent indorsement. Addressing the dispute between Diamond and First Federal, we stated that First Federal should be attentive to ongoing transactions and should make inquiry when it receives indication that something has gone wrong with the transaction. We noted, however, that the duty arises out of a general duty to mitigate damages. Significantly, First Federal was the payee of the check, which was fraudulently indorsed by the payee's agent; it was not the depositary bank. Thus, our decision should not be construed to place a duty on depository banks in favor of payees, and it is inapposite to the present circumstances.
 {¶ 43} Fifth Third comments that First American had other parties against which it could have pursued viable claims: "First American could have pursued Dayton Title for its failure to fulfill its obligations to satisfy the existing SBA mortgage loan * * * or Chari Group for payment of the SBA Note, which First American then held by assignment. * * * First American simply does not have the privity, position or relationship to recover against Fifth Third. Neither it, nor the SBA, nor County Corp. Development, were `holders' of the Payoff Check. * * * In such circumstances, the drawer of the check, here Dayton Title, might have a claim against its bank (National City Bank) that the check was not properly payable to Chari under the UCC. * * * `The remedy of the drawee is against the depositary bank for breach of warranty under Section 3-417(a)(1) or 4-208(a)(1).'"
 {¶ 44} In our ruling, we make no determination as to whether Fifth Third — or any other party to this transaction — should ultimately bear the loss occasioned by Chari's forged indorsement. Rather, we simply agree with Fifth Third and the trial court that First American's negligence claims against Fifth Third, both under the UCC and the common law, are precluded by the UCC.
 {¶ 45} The assignment of error is overruled.
 {¶ 46} The judgment of the trial court will be affirmed.
Fain, P.J. and Grady, J., concur.
[1] The evidence in the record indicates that the check was mistakenly made out to County Corp. instead of the SBA.
[2] Olympic also appealed from that ruling; however, its appeal was subsequently dismissed for want of prosecution.
[3] { ¶ a} In its entirety, R.C. 1303.44 provides:
{¶ b} (A) If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee, an indorsement of the instrument by any person in the name of the payee is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.
{¶ c} (B) If a person whose intent determines to whom an instrument is payable under division (A) or (B) of Section1303.08 of the Revised Code does not intend the person identified as payee to have any interest in the instrument or if the person identified as payee of an instrument is a fictitious person, the following rules apply until the instrument is negotiated by special indorsement:
{¶ d} (1) Any person in possession of the instrument is its holder.
{¶ e} (2) An indorsement by any person in the name of the payee stated in the instrument is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.
{¶ f} (C) Under division (A) or (B) of this section, an indorsement is made in the name of a payee if it is made in a name substantially similar to that of the payee or if the instrument, whether or not indorsed, is deposited in a depositary bank to an account in a name substantially similar to that of the payee.
{¶ g} (D) With respect to an instrument to which division (A) or (B) of this section applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.