JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, NCS Healthcare, Inc. ("NCS"), appeals from the trial court's order granting the motion for summary judgment of defendant-appellee, Fifth Third Bank ("Fifth Third") and denying its cross-motion for summary judgment. For the reasons that follow, we affirm.
 1. FACTS AND PROCEDURAL BACKGROUND {¶ 2} The record reflects that NCS is a distributor of pharmaceuticals to nursing homes and extended care facilities nationwide. Medical Logistics, Inc. ("MLI") provided delivery services for NCS pursuant to a Master Delivery and Logistics Agreement ("Master Agreement"), which commenced on January 31, 2000 and set forth an initial contract phase of 60 days. NCS and MLI subsequently amended the Master Agreement eight times, each time extending the initial contract phase for an additional 60-day period.
 {¶ 3} Sometime in 2001, a dispute arose between NCS and MLI regarding various invoices from MLI to NCS. Specifically, the parties disputed how MLI was calculating its delivery charges and whether certain deliveries had actually been made. Michael Mascali, Sr. Vice President of Operations for NCS, and John DiPace, Executive Vice President of MLI, engaged in negotiations regarding the dispute. On June 22, 2001, NCS and MLI reached a settlement agreement whereby NCS agreed to pay MLI $350,000 in satisfaction of the unpaid invoices.
 {¶ 4} Pursuant to the settlement, on June 27, 2001, NCS sent check number 117162 dated June 25, 2001, made payable to MLI in the amount of $347,621.51. NCS also sent check number 116037 dated June 21, 2001, made payable to MLI in the amount of $2,378.49. Both checks were drawn on the NCS account held at Fifth Third.
 {¶ 5} Along with the checks, NCS sent MLI a Letter Agreement, which confirmed the parties' agreement that NCS pay MLI $350,000 in "full satisfaction of any and all remaining amounts owed by NCS to MLI for the period commencing November 1, 1999 and ending May 15, 2001." NCS also sent MLI a separate Master Agreement Letter confirming "our mutual understanding and agreement * * * that the initial phase shall be extended for an additional sixty (60) day period commencing July 1, 2001 and ending August 29, 2001."
 {¶ 6} Within 24 hours of sending the checks, but before the checks had been presented for payment, NCS learned that MLI had terminated its operations and "closed its doors." On June 29, 2001, NCS placed a stop payment order on the settlement checks through Fifth Third's Transact ® computer software. Fifth Third acknowledges that it received a valid and timely stop payment order on the settlement checks. Nevertheless, Fifth Third paid both checks.
 {¶ 7} Apparently realizing its error, on July 3, 2001, Fifth Third credited the NCS account in the amount of $2,378.49 regarding check number 116037. On July 9, 2001, Fifth Third also credited the NCS account in the amount of $347,621.51. On August 30, 2001, however, Fifth Third debited $347,621.51, representing payment of check number 117162, from the NCS account. To date, Fifth Third has not taken any further action with respect to check number 116037 in the amount of $2,378.49.
 {¶ 8} NCS subsequently filed suit against Fifth Third, asserting claims for violation of R.C. 1304.32, breach of contract, and negligence regarding its wrongful payment of check number 117162. Both parties filed cross-motions for summary judgment. The trial court subsequently granted Fifth Third's motion for summary judgment and denied NCS' motion.
 {¶ 9} NCS asserts two assignments of error on appeal. It first contends that the trial court erred in granting Fifth Third's motion for summary judgment because there are genuine issues of material fact precluding summary judgment. It further contends that the trial court erred in denying its motion for summary judgment regarding liability. We address these assignments of error together because they are related.
 SUMMARY JUDGMENT STANDARD {¶ 10} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. To obtain a summary judgment under Civ.R. 56(C), the moving party must demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of informing the court of the basis of the motion and identifying those portions of the record which support the requested judgment. Vahila v. Hall (1997),77 Ohio St.3d 421, 430. If the moving party discharges its initial burden, the party against whom the motion is made then bears a reciprocal burden of specificity to oppose the motion. Id. See, also, Mitseff v.Wheeler (1998), 38 Ohio St.3d 112. Summary judgment is appropriate if, after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to that party. Zivich v. Mentor Soccer Club (1998),82 Ohio St.3d 367, 369-370; Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327. Any doubts must be resolved in favor of the non-moving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359.
 LAW AND ANALYSIS 1. Fifth Third is subrogated to MLI's rights {¶ 11} NCS' claim against Fifth Third for wrongful payment of a check, despite a timely and valid stop payment order, is governed by the provisions of the Ohio Uniform Commercial Code ("UCC"). Ed StinnChevrolet, Inc. v. Natl. City Bank (1987), 31 Ohio St.3d 150, 151.
 {¶ 12} R.C. 1304.32 (UCC 4-403), regarding a customer's right to stop payment, provides that:
 {¶ 13} "A customer, or any person authorized to draw on the account if there is more than one person, may stop payment of any item drawn on the customer's account * * * by an order to the bank describing the item or account with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it * * *." It further provides that "the burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a stop payment order * * * is on the customer."
 {¶ 14} Fifth Third does not dispute that it received a timely and valid stop payment order from NCS regarding check number 117162 in the amount of $347,621.51. Because Fifth Third paid the check despite the valid stop payment order, NCS contends that, pursuant to R.C. 1304.32, it is entitled to judgment as a matter of law regarding Fifth Third's liability.
 {¶ 15} A payor bank is not always liable for wrongful payment over a valid stop payment order, however. Rather, the payor bank's liability to its customer for improper payment under R.C. 1304.32 is entwined with its rights to subrogation pursuant to R.C. 1304.36 (UCC 4-407), which provides that a payor bank may assert, as defenses to liability, the rights the payee or other holders of the check may have against the maker of the check:
 {¶ 16} "If the payor bank has paid an item over the order of the drawer or maker to stop payment * * * to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank is subrogated to the rights of all of the following:
 {¶ 17} "(A) Any holder in due course on the item against the drawer or maker;
 {¶ 18} "(B) The payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose;
 {¶ 19} "(C) The drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."
 {¶ 20} In light of this provision, Fifth Third argues that because MLI was entitled to payment of the amount of the check in question pursuant to the settlement agreement, it is subrogated to MLI's rights as the payee and NCS' claim necessarily fails.
 {¶ 21} Fraud relating to the underlying transaction, however, can defeat the payor bank's subrogation rights with respect to the payee. See White Summers, Uniform Commercial Code § 18-6 (5th ed. 2000). In its brief in opposition to Fifth Third's motion for summary judgment, NCS argued that it was fraudulently induced to enter into the settlement agreement. In his deposition, Mascali testified that he entered into the settlement agreement with MLI on behalf of NCS based upon a contemplation of a future relationship with MLI and that without MLI's agreement to continue their relationship, NCS would not have entered into the settlement agreement. Mascali testified further that the amount of the settlement was based on NCS's ability to recoup monies in the future:
 {¶ 22} "Q. How did you arrive at the amount of $350,000 to pay to MLI at the end of June of 2001?
 {¶ 23} "A. There were a number of discussions with John DiPace and our financial team back and forth and we agreed on the number of $350,000 and understanding that, that number was higher than it should be because there was a number of disputes that we had. But again, we decided to agree to that number to move this whole process forward to try to get ourselves out of phase one. But as I recall, I don't know if there's any magic to $350,000 other than we both agree it was a number. And on our side, we strongly felt that it was an overstated number, but we figured we could receive or fix that as time went on in the next three to six months."
 {¶ 24} Mascali also testified that after NCS learned that MLI was ceasing its operations, John DiPace admitted that he had withheld material information from him during negotiation of the settlement agreement:
 {¶ 25} "* * * [John DiPace] apologized for not being able to tell me that they were closing their doors when we negotiated and came to the agreement because it was a few days before that. And he said he was instructed by his board of directors that he was not able to disclose that information and I remember saying, you put me in a very difficult position because it's a holiday weekend and we have zero time to figure out how to cover all these deliveries. And John again apologized, said that was not his [decision], but the decision of the board of directors.
 {¶ 26} "* * * When John DiPace and myself negotiated the settlement agreement and we signed that document and we agreed to extend the initial phase again through August, that was all done prior to our knowledge of the doors closing. And I don't remember if it was two days later, but it was a couple days later when we found out or the next day. I don't remember. But we had no knowledge of any intent of MLI to cease operations and that's what John DiPace apologized for, that he was unable to inform me through that process and why I said to him, I believe, that I didn't believe he was negotiating in good faith because he had knowledge that I did not in that process."
 {¶ 27} NCS argues that this evidence creates an issue of fact as to whether NCS was induced by MLI to sign the settlement agreement with the full assurance by MLI that it would continue to provide delivery services in the future. Fifth Third contends, however, that the settlement agreement reached between NCS and MLI, as confirmed in the Letter Agreement, makes no mention or reference that any part of the consideration for the payment from NCS to MLI was that MLI would continue to provide services to NCS under the Master Agreement, and, in fact, contains an integration clause barring evidence of any oral or side agreement. Accordingly, Fifth Third argues that the parol evidence rule bars NCS' attempt to supplement the contract and now argue that part of the consideration for the settlement agreement was that MLI would continue in business.
 {¶ 28} "[W]here fraud is alleged, i.e., that misrepresentation induced the parties to enter into the contract, parol evidence is admissible to supplement the contract." Taylor v. Johnson (May 25, 1995), Cuyahoga App. No. 67585, citing Niehaus v. Haven Park West, Inc. (1981),2 Ohio App.3d 24, 25. "The parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." Galmish v. Cicchini, 90 Ohio St.3d 22, 28,2000-Ohio-7. "[W]here one party to a contract has been induced to enter into it through fraud, deceit, and misrepresentation of the other party as to material matters, the defrauded party does not become bound by its terms, notwithstanding the contract contains a provision that there are no agreements or statements binding upon the parties except those contained therein. Fraud which enters into the actual making of a contract cannot be excluded from the reach of the law by any formal phrase inserted in the contract itself." Niehaus at 25, citing Sparhawkv. Gorham (1956), 101 Ohio App. 362. "[T]he presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud." Galmish at 28.
 {¶ 29} Here, however, we find that NCS produced no evidence that MLI fraudulently induced it to enter into the settlement agreement by representing that MLI would continue to provide delivery services for NCS. The agreement is clear that the payment of $350,000 by NCS to MLI was "in full satisfaction of any and all remaining amounts owed by NCS to MLI for the period commencing November 1, 1999 and ending May 15, 2001." Further, the agreement specifically provides that "this release does not cover invoice 636 dated April 20, 2001 for Sharon, PA and any servicesrendered after May 15, 2001 * * *." Thus, the agreement is very clear that it is limited to a specific time frame.
 {¶ 30} Moreover, the agreement unambiguously states that the terms contained therein "represent the entire agreement and understanding of the parties hereto concerning their agreement to make and arrange for payment of outstanding amounts due under the agreement." The agreement is also clear that the only consideration given by MLI to NCS in the settlement agreement was a full and final release of all liability with respect to the invoices at issue; there is absolutely no mention anywhere in the agreement of continuing services by MLI to NCS in consideration of the $350,000 payment.
 {¶ 31} Contrary to NCS' argument, Mascali's testimony that NCS paid more than it felt it should have paid to resolve the dispute regarding the outstanding invoices and that NCS "figured we could receive or fix that as time went on in the next three to six months" does not demonstrate that MLI fraudulently induced NCS to enter into the settlement agreement under the pretext of continuing delivery services. Rather, it demonstrates only that NCS paid more than it wanted to in settlement of the dispute. If, as NCS contends, NCS and MLI negotiated as part of the agreement that NCS would recover some of its alleged overpayment by manipulating the billing in future months, surely the parties would have included some method of calculating future delivery charges in the settlement agreement. With no mention of this purported arrangement in the agreement, the obvious conclusion is that NCS did not inform MLI of its intention to dispute future invoices to recover its alleged overpayment. Thus, it is apparent that with respect to the settlement agreement, the issue of MLI's continuing services may have been assumed by NCS, but was not negotiated by the parties.
 {¶ 32} Likewise, Mascali's testimony that DiPace apologized for not telling him prior to the agreement that MLI planned to cease operations does not indicate that MLI fraudulently induced NCS to enter into the settlement agreement. NCS has not demonstrated that DiPace had a duty to disclose the fact that MLI was ceasing operations as part of settlement negotiations with respect to invoices for past services rendered by MLI, or that DiPace purposely misrepresented this fact with respect to the settlement agreement. Although it is apparent that DiPace/MLI misled Mascali and NCS with respect to extending the Master Lease Agreement for another 60 days, NCS has not demonstrated that MLI misled NCS regarding the settlement agreement.
 {¶ 33} Accordingly, NCS failed to demonstrate that there is any genuine issue of material fact regarding the validity of the settlement agreement. Therefore, pursuant to R.C. 1304.36(B), Fifth Third is subrogated to MLI's rights on the check and can enforce the settlement agreement and MLI's right to payment from NCS of check number 117162. NCS' claim against Fifth Third for wrongful payment of the check in violation of R.C. 1304.32 therefore necessarily fails.
 2. The Bank of New York as Holder in Due Course {¶ 34} Fifth Third also argues that, pursuant to R.C. 1304.36 (A), it is subrogated to the rights of the Bank of New York as a holder in due course of check number 117162. Fifth Third asserts that the Bank of New York is a holder in due course because MLI deposited the check with the Bank of New York, which then took the check for value in giving credit to its depositor.
 {¶ 35} A depositary bank is a holder in due course when it takes a check for value, in good faith, and without notice of any claim or defense against it. See R.C. 1303.32 (UCC 3-302). Here, however, Fifth Third has produced no evidence to support its argument that the Bank of New York was a holder in due course. In its brief opposing NCS' motion for summary judgment, Fifth Third asserted that it was obtaining an affidavit of a Bank of New York representative and would file the affidavit with the court. Fifth Third never did so, however, and therefore, failed to provide any Civ.R. 56(C) evidentiary material to support its argument that the Bank of New York is a holder in due course.
 3. NCS failed to show a loss {¶ 36} Pursuant to R.C. 1304.32(C), a bank customer seeking damages for the improper payment of a check over a valid stop payment order carries the burden of proving "the fact and amount of loss" resulting from the bank's payment. In establishing a loss, the customer must show some loss other than the mere debiting of the customer's account. Chutev. Bank One of Akron (1983), 10 Ohio App.3d 122, 125, citing Thomasv. Marine Midland Tinkers Natl. Bank (1976), 86 Misc.2d 284,381 N.Y. Supp.2d 797.
 {¶ 37} NCS argues that it sustained a loss of over $640,000 in additional delivery expenses incurred when MLI breached the settlement agreement by going out of business and forcing NCS to find other ways to deliver its pharmaceuticals. We disagree.
 {¶ 38} In order to prevail against a bank that has ignored a stop payment order, "[t]he customer must show that (i) the account was debited, (ii) some other loss was suffered, and (iii) the bank's noncompliance with the stop order was the `but for' cause." W. Hillman,Basic UCC Skills 1989, Article 3 and Article 4, p. 319. Here, any loss incurred by NCS in contracting for other delivery services arose not from the bank's wrongful payment of the check, but from MLI's breach of the Master Delivery and Logistics Agreement. NCS was not forced to find other delivery services because Fifth Third wrongfully paid the check to MLI, but because MLI wrongfully terminated the delivery services it had promised to provide pursuant to the Master Agreement. Indeed, NCS admitted as much in its brief in opposition to Fifth Third's motion for summary judgment, when it stated, "NCS estimates that it incurred over $640,000 in damages relating to MLI's wrongful termination of delivery servicesand breach of the Master Delivery and Logistics Agreement." (Emphasis added.)
 {¶ 39} Moreover, a bank customer's "loss" relating to wrongful payment of a check over a valid stop payment order "is equivalent to his rights and defenses against the parties to which the bank may be subrogated."Chute, supra at 125. Thus, in order to show a 4-403 loss, the bank customer must show that he had defenses to payment on the check that were good against a holder or holder in due course, or that he had a good defense to liability on the underlying transaction. White Summers,Uniform Commercial Code § 18-6 (5th ed. 2000).
 {¶ 40} As discussed above, NCS failed to demonstrate that it has any defenses to liability on the check or the underlying transaction. It produced no evidence that it was fraudulently induced to enter into the settlement agreement, nor does the agreement contain any condition that MLI remain in business as consideration for NCS' payment. Accordingly, NCS has no defense to liability on the check or the underlying transaction and, therefore, has not demonstrated that it incurred any loss as a result of the bank's payment of the check.
 4. Common Law Claims of NCS {¶ 41} In addition to its claim for wrongful payment pursuant to R.C.1304.32, NCS asserted common law claims for breach of contract and negligence. NCS now argues that the trial court erred in granting summary judgment in favor of Fifth Third because there are genuine issues of material fact regarding whether Fifth Third breached its written contract with NCS in paying check number 117162 over the stop payment order, and whether Fifth Third failed to exercise reasonable care in paying the check.
 {¶ 42} The Uniform Commercial Code was designed to provide reliability, uniformity, and certainty as to the rights and liabilities pertaining to negotiable instruments. Amzee Corp. v. ComericaBank-Midwest, Franklin App. No. 01AP-465, 2002-Ohio-3084, at ¶ 47. In order for the UCC to be effective, parties in commercial transactions must be able to rely on the remedies the UCC provides. Id. If parties are permitted to avoid the remedies of the UCC and plead common law causes of action, the reliability, uniformity and certainty of the UCC disappears. Id. at ¶ 48.
 {¶ 43} R.C. 1301.03 (UCC 1-103) provides that:
 {¶ 44} "Unless displaced by the particular provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309, and 1310. of the Revised Code, the principals (sic) of law and equity, including the law [of] merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement their provisions." Thus, the plain language of the statute permits common law principles to supplement the statutory scheme.
 {¶ 45} R.C. 1301.33 permits the use of common law principles, however, only when they are not "displaced" by the UCC. Thus, although we are unwilling to conclude that the UCC supplants all common law causes of action, "if the UCC has spoken on an area of law, then the common law equity claims for that area of law are superceded." Natl. City Bank v.The Citizens Natl. Bank of Southwest Ohio, Montgomery App. No. 20323,2004-Ohio-6060, at ¶ 30. The UCC provides the exclusive remedy where the dispute is governed by its statutory provisions. Olympic Title Ins. Co.v. Fifth Third Bank of Western Ohio, Montgomery App. No. 20145, 2004-Ohio-4795, at ¶ 31. "Common law causes of action may not be raised to circumvent the UCC's rights, claims, and defenses where the statute applies." Id.
 {¶ 46} In this case, the factual circumstances are contemplated by R.C. 1304.32 and 1304.36, which govern the payor bank's liability for failure to follow a legitimate stop payment order. Accordingly, NCS' common law breach of contract and negligence claims cannot be raised where the UCC already governs.
 CONCLUSION {¶ 47} Because Fifth Third is subrogated to the rights of MLI regarding the settlement agreement, and because the common law claims of NCS are supplanted by the UCC, the trial court properly granted summary judgment in favor of Fifth Third. Appellants' assignments of error are therefore overruled.
Affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, P.J., and Sweeney, J., Concur.