OPINION
{¶ 1} Appellant, Chester Township Board of Trustees ("the Trustees"), appeals the judgment entered by the Geauga County Court of Common Pleas. The trial court granted a motion for summary judgment filed by appellee, Bank One, N.A. ("Bank One"). *Page 2 
 {¶ 2} In 1992, Michael Spellman was elected clerk of Chester Township. Chester Township had a checking account with Bank One. The version of R.C. 507.11(B) in effect during the relevant times of this matter provided:
 {¶ 3} "No money belonging to the township shall be paid out, except upon an order signed by at least two of the township trustees, and countersigned by the township clerk."
 {¶ 4} Thus, on a properly payable check, two of the Trustees and Spellman, at a minimum, needed to sign the check. Beginning in 1996, Spellman engaged in an embezzlement scheme, in which he stole over $4 million from the township. Spellman drafted checks payable to himself. Then, he forged the names of two of the trustees and signed his own name. Bank One paid over 300 checks of this nature. Spellman deposited the money into his personal bank accounts at other banks.
 {¶ 5} In 1999, the Trustees became concerned about the possibility of Spellman embezzling money. Detective Harry Eidan of the Chester Township Police Department was assigned to investigate the matter. The Trustees gave Detective Eidan a letter of authorization to obtain the township's banking records at Bank One. Detective Eidan contacted Margaret Lodge, a Senior Investigator in Bank One's Security Department. Detective Eidan met with Lodge on two occasions, once at a restaurant in Chesterland and once at Lodge's office in Cleveland. At the meetings, Detective Eidan told Lodge that "there were suspicions that [Spellman] may have been embezzling money and the trustees and the chief wanted [him] to look into it." Also, Detective Eidan informed Lodge that the Trustees did not have the original bank statements or cancelled checks. *Page 3 
 {¶ 6} As a result of the meetings, Lodge provided copies of the township's bank statements to Detective Eidan. Detective Eidan was unable to determine any wrongdoing by inspecting the bank statements, because the statements did not contain the payees' names. Detective Eidan knew he would have to inspect the cancelled checks in order to determine whether Spellman was engaged in inappropriate activity. However, when Detective Eidan approached Chester Township Police Chief Oros about this undertaking, Chief Oros told him that the Trustees had decided to halt the investigation. At that point, Detective Eidan ceased working on this matter. Since the investigation was terminated, the Trustees did not become aware of Spellman's embezzlement activities at that time. Moreover, while Bank One assisted Detective Eidan in his investigation, it did not conduct its own internal investigation.
 {¶ 7} The forgeries were finally discovered in 2003. As a result of his activity, Spellman was indicted by the grand jury. Spellman pled guilty to 334 felony counts.[1] In addition to a prison term, Spellman was ordered to pay $4,286,893.46 in restitution.[2] Presumably, Spellman did not pay this restitution. Thus, the Trustees initiated the instant action against Spellman, Bank One, and other banks involved in the processing of the checks. This appeal only concerns Bank One and the Trustees.
 {¶ 8} On November 12, 2004, the trial court issued an order regarding discovery. The trial court ruled "[e]xcept as otherwise ordered herein or agreed upon between counsel, no further discovery shall be conducted until further order of the court." Bank One filed its motion for summary judgment on November 22, 2004. Attached to Bank One's motion for summary judgment were several affidavits in support *Page 4 
of the motion, including affidavits from Nancy Landholt, an IP manager in the IP Department at Bank One; Herman Counts, III, a First Vice President and the Midwest Region Statement Operations Manager in the National Statement Processing at Bank One; and Cheryl Cimperman, a Vice President and Security Manager in the Fraud Department and Investigations Department of Bank One. In December 2004, the Trustees filed a motion to stay the trial court's November 12, 2004 order regarding discovery and resume discovery in the matter. The Trustees sought to depose the three affiants mentioned above, as well as 14 other individuals.
 {¶ 9} This matter was assigned to Judge Inderlied, who denied the Trustees' motion. Later, Judge Inderlied retired and was succeeded by Judge Fuhry. Judge Fuhry granted Bank One's motion for summary judgment, denied a motion for partial summary judgment filed by the Trustees, and denied the additional discovery request by the Trustees.
 {¶ 10} The Trustees raise three assignments of error. The Trustees' first assignment of error is:
 {¶ 11} "The trial court erred by GRANTING the appellee's motion for summary judgment."
 {¶ 12} Pursuant to Civ.R. 56(C), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[3] In addition, it must appear from the evidence and stipulations that reasonable minds can come to only one conclusion, which is adverse to the nonmoving *Page 5 
party.[4] The standard of review for the granting of a motion for summary judgment is de novo.[5]
 {¶ 13} In Dresher v. Burt, the Supreme Court of Ohio set forth a burden-shifting exercise to occur in a summary judgment determination. Initially, the moving party must point to evidentiary materials to show that there are no genuine issues of material fact and it is entitled to judgment as a matter of law.[6] If the moving party meets this burden, a reciprocal burden is placed on the nonmoving party to show that there is a genuine issue of fact for trial.[7]
 {¶ 14} Initially, we will address the Trustees' argument that the trial court erred in concluding that the statute of limitations applied to bar the Trustees' claim regarding three warrants. The Trustees claim Spellman, with the assistance of Bank One, converted three warrants payable to Chester Township into checks payable to himself and, then, deposited those checks in his personal account. This conduct occurred in 1996.
 {¶ 15} The trial court concluded that the Trustees' claim was barred by the statute of limitations set forth in R.C. 1109.69, which provides, in part:
 {¶ 16} "(A) Every bank shall retain or preserve the following bank records and supporting documents for only the following periods of time:
 {¶ 17} "* * *
 {¶ 18} "(2) For six years: *Page 6 
 {¶ 19} "(c) Official checks, drafts, money orders, and other instruments for the payment of money issued by the bank and that have been canceled, after the date of issue.
 {¶ 20} "* * *
 {¶ 21} "(F) Any action by or against a bank based on, or the determination of which would depend on, the contents of records for which a period of retention or preservation is set forth in divisions (A) or (B) of this section shall be brought within the time for which the record must be retained or preserved."
 {¶ 22} In analyzing this statute, which has since been renumbered, the Supreme Court of Ohio held that the six-year statute of limitations set forth in R.C. 1109.69 applies to bar all relevant claims, even if there is a more liberal statute of limitations elsewhere in the Revised Code.[8]
 {¶ 23} In this matter, Bank One was permitted to destroy the warrants, pursuant to R.C. 1109.69(A)(2)(c), in 2002, which was six years after the date of issue. The Trustees' complaint was not filed until 2004. Thus, the trial court correctly determined that the Trustees' claims regarding the conversion of the warrants were barred by the statute of limitations.
 {¶ 24} This matter primarily concerns the forgery of checks and the respective duties of the customer and the bank in relation thereto. These matters are governed by the Uniform Commercial Code ("UCC"), which has been adopted by Ohio and codified in the Revised Code.[9] The applicable Revised Code section for consideration in this appeal is R.C.1304.35. *Page 7 
 {¶ 25} It is undisputed that Spellman forged the names of two of the Trustees on the checks. As such, the checks were not "properly payable," and Bank One improperly paid these checks pursuant to R.C. 1304.30. The focus of this matter is the affirmative defense established by R.C.1304.35, which provides, in part:
 {¶ 26} "(A) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.
 {¶ 27} "(B) If the items are not returned to the customer, the person retaining the items shall either retain the items or, if the items are destroyed, maintain the capacity to furnish legible copies of the items until the expiration of seven years after receipt of the items. A customer may request an item from the bank that paid the item, and that bank must provide in a reasonable time either the item or, if the item has been destroyed or is not otherwise obtainable, a legible copy of the item.
 {¶ 28} "(C) If a bank sends or makes available a statement of account or items pursuant to division (A) of this section, the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts. *Page 8 
 {¶ 29} "(D) If the bank proves that the customer failed with respect to an item to comply with the duties imposed on the customer by division (C) of this section, the customer is precluded from asserting either of the following against the bank:
 {¶ 30} "(1) The customer's unauthorized signature or any alteration on the item if the bank also proves that it suffered a loss by reason of that failure;
 {¶ 31} "(2) The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.
 {¶ 32} "(E) If division (D) of this section applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the bank's failure substantially contributed to the loss, the loss is allocated between the customer who is precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with division (C) of this section and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under division (D) of this section does not apply.
 {¶ 33} "(F) Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer discover and report his unauthorized signature on or any *Page 9 
alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration[.]"
 {¶ 34} This court recently analyzed the requirements of R.C. 1304.35
in the case of Mueller v. Miller[10] While we adhere to Mueller v.Miller in this matter, we note the Mueller case is distinguishable from the instant action because there were no allegations that the bank inMueller paid the items without good faith or ordinary care.[11] This court held, "R.C. 1304.35(C) imposes two duties upon the bank customer: (1) the duty to `exercise reasonable promptness' in examining bank statements and canceled checks to determine whether there have been any unauthorized payments, and (2) the duty to promptly notify the bank of unauthorized payments that should have come to the customer's attention."[12] If the customer discovers an error and promptly reports it, the customer has complied with R.C. 1304.35(C). If the customer has not exercised "reasonable promptness" in examining its bank statements and has not promptly notified the bank of unauthorized signatures, then the customer is precluded from asserting subsequent unauthorized payments from the "same wrongdoer" if such subsequent items were (1) "paid in good faith" and (2) "before the bank received notice from the customer of the unauthorized signature," provided that (3) the customer had at least 30 days to examine the initial statement.[13]
However, even if the "same wrongdoer" provision of R.C. 1304.35(D) applies to unauthorized signatures, the customer still has the opportunity to demonstrate that the bank failed to exercise *Page 10 
ordinary care in paying the item.[14] If the customer is successful in that regard, the loss is allocated proportionately between the customer and the bank according to the extent each contributed to the loss. Moreover, if the customer can demonstrate that the bank did not pay the item in good faith, it can pursue items from the same wrongdoer, as the preclusion in R.C. 1304.35(D) does not apply.[15] If the customer waits more than one year to report an unauthorized signature, the customer is barred from recovering against the bank, regardless of the bank's lack of care in paying the instrument.[16]
 {¶ 35} The first issue is whether Bank One sent the bank statements to the "customer," pursuant to R.C. 1304.35(A). As used in this section, "`[c]ustomer' means a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."[17]
 {¶ 36} The Supreme Court of Ohio has held, "[w]hen the depositor is a township the bank may return the vouchers or cancelled warrants or checks to the duly elected, qualified and acting clerk-treasurer of such township."[18] Am. Sur. Co. of New York v. The Cortland Sav. BankingCo. is factually similar to the case sub judice, in that the township clerk-treasurer stole money from a township by drafting warrants payable to himself and forging the names of two of the township trustees on them. The Supreme Court of Ohio noted that the depositor of the funds was the township itself, not the trustees nor the clerk.[19] The court held that the township clerk, if duly elected and qualified, is the appropriate individual to send bank statements and cancelled checks to, *Page 11 
even if the clerk is engaging in criminal conduct by stealing township funds by means of forging the names of the trustees, provided the bank was unaware of his conduct.[20]
 {¶ 37} The Trustees argue that Am. Sur. Co. of New York v. TheCortland Sav. Banking Co. is inapplicable because it was decided prior to the enactment of the UCC. While the Trustees are correct in noting that this case was decided prior to Ohio's adoption of the UCC, we believe it is applicable to the case sub judice, especially considering the virtually identical fact patterns.
 {¶ 38} In this matter, Bank One sent the bank statements to the following address:
 "Chester Township Trustee C/O Michael W. Spellman 12701 Chillicothe Rd. Chesterland, OH 44026"
 {¶ 39} The township's account was in the name of the Trustees. However, pursuant to R.C. 507.11(B), Spellman, as township clerk, was required to sign every check. Spellman, as clerk, was responsible for balancing the financial matters of the township. Thus, as a practical matter, it made sense that the bank statements should be addressed to his attention. Further, the Trustees were aware that the statements were being sent to Spellman and did not object to this arrangement. Simply stated, the Trustees trusted Spellman to handle the finances of the township, including the review of the bank statements. Further, the fact that Detective Eidan was assigned to conduct an investigation reveals that the Trustees knew they could obtain original bank statements and copies of the cancelled checks if they desired. *Page 12 
 {¶ 40} The trial court did not err in concluding that Bank One sent copies of the bank statements to the Trustees.
 {¶ 41} A critical issue in this matter is when the Trustees notified Bank One regarding the forged checks. Since Spellman forged the signatures of two of the Trustees, this matter concerned "unauthorized signatures." Pursuant to R.C. 1304.35(C), the Trustees needed to "promptly notify the bank of the relevant facts" regarding the unauthorized signatures.
 {¶ 42} Spellman was forging checks from 1996 through 2003. Bank One claims it did not have notice of the unauthorized signatures until this lawsuit was filed, in February 2004. The Trustees argue that the bank was on notice at one of the following three dates (1) 1996, when Spellman converted the warrants; (2) 1999, when detective Eidan met with Bank One officials in Cleveland to notify them of his suspicions of Spellman embezzling money; and (3) in early 2003, when the Trustees (a) served subpoenas on Bank One; (b) a letter was sent from investigator DiCicco; (c) Spellman's activities were reported in newspapers, and (d) Bank One employees met with the Trustees to offer a fraud protection service to avoid future incidents.
 {¶ 43} First, we will address the Trustees' contention that Bank One was notified about Spellman's activities in 1996, when Spellman converted the warrants. Again, R.C. 1304.35(C) required the Trustees to notify Bank One about the relevant facts related to an "unauthorized signature." This was clearly not done. Bank One had no notice the warrants were fraudulently endorsed.
 {¶ 44} Next, we will examine whether the Trustees notified Bank One about the unauthorized signatures in 1999. The Trustees argue that Detective Eidan's *Page 13 
investigation put Bank One on notice of the unauthorized signatures. We disagree. Detective Eidan informed Bank One that there were suspicions that Spellman was embezzling money. He did not state that Spellman was suspected of specifically forging the Trustees' names on checks payable to himself. In response to Detective Eidan's inquiry, Bank One provided additional copies of the Trustees' bank statements to Detective Eidan. These actions suggest that Bank One intended to assist Detective Eidan. However, a generalized statement regarding suspicions of embezzlement is not the equivalent of an unequivocal statement notifying Bank One of an unauthorized signature, as required by R.C. 1304.35(C). While it may be sufficient to place them on notice of wrongdoing, in a good faith analysis pursuant to R.C 1304.35(D), it is not "notice" as required by R.C. 1304.35(C).
 {¶ 45} For the reasons stated above, there is no genuine issue of material fact on the issue of whether the Trustees notified Bank One about the unauthorized signatures in 1996 or 1999. There was no such notification.
 {¶ 46} The Trustees also contend Bank One was notified about the unauthorized signatures in 2003. In January 2003, Spellman's activities were finally discovered. Also, in January 2003, Bank One was sent a subpoena, which requested copies of cancelled checks made payable to Spellman. A copy of this subpoena was attached to the Trustees' response in opposition to Bank One's motion for summary judgment. Also attached to that pleading was an affidavit from Richard DiCicco. DiCicco is a financial investigator hired by the Trustees. He states that shortly after the initial subpoena was issued, additional subpoenas were issued and he directly contacted Bank One on several occasions regarding suspicious checks payable to Spellman. Additionally, on *Page 14 
February 23, 2003, DiCicco sent a letter to Bank One requesting copies of 81 specific checks. A copy of this letter was attached to the Trustees' response in opposition to Bank One's motion for summary judgment. In early 2003, Richard Fetzer was a Bank One employee and met with DiCicco about the Spellman incident. In his deposition, Fetzer acknowledged reading newspaper accounts and learning that Spellman embezzled the money by forging checks. While he was not certain about the date, he believed this occurred by April 2003. Finally, Fetzer and another Bank One employee, Florence Hatvany, met with some of the Trustees in April 2003. At that time, Hatvany offered fraud protection services to the Trustees to avoid a similar problem in the future.
 {¶ 47} The Trustees presented evidence that, in 2003, (1) they notified Bank One regarding a problem with Spellman embezzling money, (2) Bank One was sent subpoenas regarding the matter, (3) copies of specific checks were requested, (4) a Bank One employee knew Spellman embezzled money by forging checks, and (5) Bank One offered the Trustees fraud protection services to avoid a repeat offense. The 2003 incidents, for purposes of a summary judgment exercise, create a genuine issue of material fact as to whether Bank One was notified about the unauthorized signatures in 2003.
 {¶ 48} In addressing the Trustees' arguments that a "good faith" provision is implied in R.C. 1304.35(F), we will analyze two opposing cases from other jurisdictions. For this analysis, we will refer to Section 4-406(F) of the UCC, which is identical to R.C. 1304.35(F) for our analysis.
 {¶ 49} In Halifax Corp. v. First Union Nat. Bank, the Supreme Court of Virginia rejected an argument that Section 4-406(F) of the UCC contains an implied provision *Page 15 
that the bank act in good faith.[21] The court noted that UCC 4-406(D) expressly limits that preclusion to items that were "`paid in good faith by the bank.'"[22] The court reasoned that the inclusion of this language in subsection (D), coupled with the exclusion of the language in subsection (F), is indicative of the drafters' intent to not provide the good faith requirement to UCC 4-406(F).[23] The court also rejected the argument that UCC 1-203 provides a good faith provision to UCC 4-406. The court held that since UCC 4-406 is a statute of specific application while UCC 1-203 is a statute of general application, UCC 4-406 prevails to the extent there is a conflict between the two provisions.[24]
 {¶ 50} The Trustees rely on Falk v. The Northern Trust Co., a decision from the First District Court of Appeals of Illinois.[25] InFalk, the court, in a two-to one decision, held that UCC 4-406(F) contains a good faith provision, due to the language in UCC 1-203 and the fact that the prior version of UCC 4-406 contained a good faith requirement, and there was no indication from the drafters that this provision was intended to be stricken.[26] Further, the court held that "the public policy behind placing the burden on the customer to determine unauthorized signatures or alterations is not served when the bank is a party, either actively or passively, to a scheme to defraud the customer."[27]
 {¶ 51} In contrasting these cases, the trial court decided that theHalifax decision was a better interpretation of the statutory language. We agree. We recognize the public policy concerns raised by the Trustees and the Falk Court. However, as noted by *Page 16 
the Supreme Court of Virginia, UCC 4-406(F) does not contain a good faith provision and the language from other sections of the UCC, including Section 4-406(D), suggests the drafters' intention that a good faith provision not be included in UCC 4-406(F). We will not judicially create a good faith provision where one does not exist.
 {¶ 52} In Falk, part of the court's reasoning was that the bank in that case directly profited from the embezzler's actions, because the embezzler used the improperly obtained funds to pay down a personal loan with the same bank.[28] In this matter, it appears the trial court was noting that there was no evidence that Bank One earned profits in excess of what it would have earned had Spellman not been embezzling. However, in light of our analysis declining to follow Falk and the lack of a good faith requirement in R.C. 1304.35(F), the question of whether the bank profited has little, if any, relevance in this matter.
 {¶ 53} However, we have determined that a good faith provision does apply to Bank One under R.C. 1304.35(D). Since the evidence demonstrates that there is no genuine issue of material fact that the Trustees failed to notify Bank One regarding the unauthorized signatures prior to January 2003, pursuant to R.C. 1304.35(C), the earliest possible time Bank One could be liable is one year prior to the date it was notified about the unauthorized signatures, pursuant to R.C. 1304.35(F). Therefore, Bank One is entitled to judgment as a matter of law for any checks it paid prior to January 2002. *Page 17 
 {¶ 54} While we do not imply a "good faith" provision into R.C.1304.35(F), we note that Bank One was required to pay the items in good faith pursuant to R.C. 1304.35(D). Further, the bank needed to "exercise ordinary care" in paying the items pursuant to R.C. 1304.35(E).
 {¶ 55} The definition of "good faith" as used in R.C. 1304.35 is set forth in R.C. 1303.01(A)(4),[29] which provides, "`[g]ood faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing."
 {¶ 56} In this matter, the summary judgment Civ.R. 56 evidence that triggers the good faith and ordinary care analysis is Detective Eidan's statements regarding the "concerns" about Spellman embezzling money. It is clearly arguable that Bank One was on heightened notice of the potential irregularities in the checks made payable to Spellman from that date (1999) forward.
 {¶ 57} As the moving party, Bank One bore the burden of demonstrating that no genuine issues of material fact existed. They have not done so here. Reasonable minds could readily differ on the industry standard to be applied when presented with a police detective who raises "concerns" about a township clerk "embezzling" money from the township.
 {¶ 58} A genuine issue of material fact exists as to whether Bank One paid the items in good faith and by means of ordinary care following the statement from Detective Eidan that the Trustees suspected Spellman of embezzling funds from the account. *Page 18 
 {¶ 59} We acknowledge that we have held that Detective Eidan's statements to Bank One were not sufficient to put Bank One on notice of specifically forged signatures as required by R.C. 1304.35(C), but they may be sufficient to provide Bank One with heightened notice of improper activity sufficient to trigger the good faith provisions of the statute.
 {¶ 60} The Trustees also claim that this matter is governed by the Ohio Uniform Depository Act ("UDA").[30] The Trustees argue that Bank One, as a depository of public funds, was required to meet additional obligations. The purpose of the UDA is to protect public funds in the result of bank failure. The Trustees argue that Bank One's failure to comply with the requirements of the UDA created a fiduciary relationship between the parties.
 {¶ 61} As Bank One notes, a bank-customer relationship is generally one of debtor-creditor, rather than a fiduciary relationship.[31] The Trustees contend that there was no contract between themselves and Bank One. They argue that Bank One dealt exclusively with Spellman and permitted Spellman to change the terms of the accounts. In light of this argument, the Trustees assert that the relationship with Bank One was no longer one of bank-customer, but was a fiduciary relationship.
 {¶ 62} There was a contract between the parties. The Trustees banked with Bank One since the 1970s. The fact that Spellman may have changed certain terms of the agreement does not erase the contract. Initially, we question whether the changes Spellman made to the accounts were so material as to void the underlying contract between the parties. Next, to the extent Spellman did change the accounts, he was *Page 19 
acting as an agent for the Trustees. He acted under the apparent authority of the Trustees, in that he led Bank One to believe he had the authority to change the accounts.[32] The Trustees ratified these changes by permitting Spellman to have unilateral control over their bank accounts, by continuing the relationship with Bank One under the terms agreed to by Spellman, and by failing to repudiate any of the changes.
 {¶ 63} The Trustees' arguments in support of a fiduciary relationship do not address the underlying issue in this matter. Quite simply, this matter concerned unauthorized signatures by Spellman, which are clearly governed by the UCC. As a matter of law, there was no fiduciary relationship between the parties created through a lack of compliance with the UDA or the lack of a formal contract so as to permit the circumvention of the clear mandates of the UCC.
 {¶ 64} The Trustees claim Bank One aided and abetted Spellman in his embezzlement efforts.
 {¶ 65} "Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."[33] *Page 20 
 {¶ 66} The Trustees argue that Bank One's alleged violations of the UDA assisted Spellman in his activities. However, all of Bank One's alleged actions, even when taken together, do not demonstrate that Bank One had a role in Spellman's illegal activity that rose to the level of knowingly and substantially assisting Spellman in his efforts. At most, the evidence demonstrates that Bank One failed to take additional steps to uncover Spellman's illegal conduct. There is no evidence that Bank One, in a knowing and substantial way, actively participated in Spellman's scheme to embezzle money from the Trustees.
 {¶ 67} The trial court did not err by entering summary judgment in favor of Bank One in relation to the checks cashed prior to January 2002. However, the trial court erred in entering summary judgment in favor of Bank One for the checks cashed from January 2002 through January 2003.
 {¶ 68} The Trustees' first assignment of error has merit to the extent indicated.
 {¶ 69} The Trustees' second assignment of error is:
 {¶ 70} "The trial court erred when on or about December 20, 2004, it DENIED the appellant's motion to vacate or stay the trial court's order judgment entry of 11/12/04 as it relates to Bank One, N.A. (Stay of discovery and leave to file a motion for summary judgment) as well as its motion to resume discovery (per Civil Rule 56(E F))."
 {¶ 71} When reviewing a trial court's decision in a discovery matter, the standard of review is whether the trial court abused its discretion.[34] "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[35] *Page 21 
 {¶ 72} There were three affidavits that the Trustees claim prejudiced them because they were not given a chance to depose the affiants. Nancy Landholt stated that Bank One used the Automated Clearinghouse (ACH) method to process checks. There was minimal dispute as to whether Bank One used this system, so the Trustees were not prejudiced by not being able to depose her. Moreover, the use of the ACH system was of little relevance in light of the R.C. 1304.35(F) preclusion. Herman Counts stated bank statements were sent to the Trustees. The only dispute regarding this statement is whether sending the statements addressed the way they were constituted sending the statements to the customer. This was a question of law. There was no dispute as to where the statements were sent. Finally, Cheryl Cimperman stated that no one reported any unauthorized signatures. There was no evidence that the Trustees reported any unauthorized signatures to Bank One prior to January 2003. Cheryl Cimperman stated that the records did not show any reports of unauthorized signatures.
 {¶ 73} The Trustees sought to depose these individuals as well as up to 14 additional employees of Bank One. The discovery in this case was substantial, and the trial court indicated that it had not gone well.
 {¶ 74} In regard to the checks cashed prior to January 2002, we have held that there is no good faith provision applicable to these checks pursuant to R.C. 1304.35(F). Therefore, additional discovery in regard to these checks was unnecessary, as Bank One was entitled to judgment as a matter of law pursuant to the preclusion contained in R.C. 1304.35(F). Thus, in regard to these checks, the trial court did not abuse its discretion in denying the Trustees' discovery request. *Page 22 
 {¶ 75} In regard to the checks cashed subsequent to January 2002, we note that we are remanding this matter to the trial court. If the Trustees believe they need additional discovery relating to these cheeks, they can file a new motion with the trial court. A determination of that motion will lie within the sound discretion of the trial court. Thus, in relation to these checks, the Trustees' assignment of error is moot.
 {¶ 76} The Trustees' second assignment of error is without merit as it relates to the checks cashed prior to January 2002 and is moot as it relates to checks cashed subsequent to that date.
 {¶ 77} The Trustees' third assignment of error is:
 {¶ 78} "The trial court erred when it DENIED the appellant's motion for partial summary judgment."
 {¶ 79} In this assignment of error, the Trustees claim the trial court erred when it determined their motion for partial summary judgment was moot. The trial court addressed all of the issues raised in the Trustees' motion for partial summary judgment, including their common law claims, in its analysis of Bank One's motion for summary judgment. The trial court concluded that there were no genuine issues of material fact and Bank One was entitled to judgment as a matter of law. The effect of this decision was that there were no further claims against Bank One. As such the trial court did not err by denying the Trustees' motion for partial summary judgment as moot. *Page 23 
 {¶ 80} The Trustees' third assignment of error is without merit.
 {¶ 81} The judgment of the trial court is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this opinion.
COLLEEN MARY OTOOLE, J., concurs,
CYNTHIA WESTCOTT RICE, P.J., dissents with Dissenting Opinion.
[1] See State v. Spellman, 160 Ohio App.3d 718, 2005-Ohio-2065, at ¶ 3.
[2] Id. at ¶ 4.
[3] Dresher v. Burt (1996), 75 Ohio St.3d 280, 293.
[4] Civ.R. 56(C).
[5] Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
[6] Dresher v. Burt, 75 Ohio St.3d at 293.
[7] Id.
[8] Abraham v. National City Bank Corp. (1990), 50 Ohio St.3d 175,178.
[9] R.C. 1301.01, et. seq.
[10] Mueller v. Miller, 162 Ohio App.3d 698, 2005-Ohio-4213.
[11] Id.
[12] Id. at ¶ 25.
[13] R.C. 1304.35(D)(2).
[14] R.C. 1304.35(E).
[15] R.C. 1304.35(E).
[16] R.C. 1304.35(F).
[17] R.C. 1304.01(A)(5).
[18] Am. Sur. Co. of New York v. The Cortland Sav. Banking Co.
(1944), 143 Ohio St. 353, paragraph two of the syllabus.
[19] Id. at 357.
[20] Id. at 357-358.
[21] Halifax Corp. v. First Union Nat. Bank (2001),546 S.E.2d 696.
[22] Id. at 702, quoting UCC 4-406(D).
[23] Id.
[24] Id. at 703.
[25] Falk v. The Northern Trust Co. (2001), 763 N.E. 2d 380.
[26] Id. at 385-386.
[27] Id. at 387.
[28] Falk v. The Northern Trust Co., 763 N.E. 2d at 382
[29] R.C. 1304.01(C)(4).
[30] R.C. 135.01, et. seq.
[31] (Citations omitted.) Herbert v. Banc One Brokerage Corp. (1994),93 Ohio App.3d 271, 275.
[32] See Miller v. The Wick Bld. Co. (1950), 154 Ohio St. 93,95-96.
[33] (Citations omitted.) Halberstam v. Welch (C.A.D.C.1983), 227 U.S. App. D.C. 167, 705 F.2d 472, 477.
[34] Mauzy v. Kelly Servs. Inc. (1996), 75 Ohio St.3d 578, 592.
[35] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.