**CHESLER, Appellee**

v.

**DOLLAR BANK, FEDERAL SAVINGS BANK, Appellant.**

[Cite as *Chesler v. Dollar Bank, Fed. Sav. Bank*, 193 Ohio App.3d 343, 2011-Ohio-1743.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 95435.

Decided April 7, 2011.

O'Shea & Associates Co., L.P.A., and Michael J. O'Shea, for appellee.

Chernett Wasserman Yarger, L.L.C., and David M. Dvorin, for appellant.

---

JAMES J. SWEENEY, Judge.

{¶ 1} Defendant-appellant, Dollar Bank, Federal Savings Bank ("Dollar Bank"), appeals from the judgment of the trial court rendered in favor of plaintiff-appellee, David Chesler, in Chesler's action against the bank for improper payment of forged checks. For the reasons set forth below, we affirm.

{¶ 2} Chesler filed this action against Dollar Bank on October 3, 2008, and alleged that the bank negligently cashed a series of checks, which totaled $18,720, forged by Pedro Velez. Dollar Bank denied liability and asserted, as an affirmative defense, that Chesler failed to use ordinary care over his account and failed to promptly notify the bank of the forgeries.

{¶ 3} The matter proceeded to a bench trial on August 7, 2009.

{¶ 4} Chesler testified that he lives at East 71st Street and Euclid Avenue, in a loft above a commercial establishment. A portion of the loft is used for business operations and has a long table, bookshelf, and computer. Chesler keeps his checkbook in a drawer in this business area. The checkbook is a large aluminum-covered book that has a register and attached carbon-copy forms for recording the information on each check that is written. Chesler further established that he opened the account at the downtown branch and provided Dollar Bank with his telephone number and a completed signature card.

{¶ 5} Finally, Chesler established that he noticed the forgeries on June 16, 2008. He became suspicious on this date after observing that the check statement contained a large amount of checks. He did not suspect prior to this time that Velez had stolen checks from him or that checks from his checking account were being forged, and no checks had bounced. In total, Velez had forged and negotiated 28 checks from Chesler's checking account and had improperly obtained $19,135 in the time period from April 7, 2008, to June 10, 2008. Dollar Bank cashed a number of the checks; prior to doing so, the bank did not call Chesler to determine whether the checks were authorized and did not compare the signature on the check with the signature card on file for the account.

{¶ 6} On cross-examination, Chesler acknowledged that when he opened the checking account, he had signed the following agreements:

I/we agree to conform to the agreement set forth on the reverse side of this card, and hereby acknowledge receipt of the rules and resolutions * * * governing this account.

We agree to conform to, and to be bound by the bylaws of Dollar Bank, and rules and regulations governing this account, including any amendments thereto.

We acknowledge this account is subject to all applicable laws, governmental regulations, and Dollar bank's procedures and policies.

{¶ 7} An additional deposit agreement was promulgated on June 1, 2007. This agreement stated that the bank is not barred by any acts of waiver, recognized that automated procedures are in place and that the bank does not require verification of the maker's signature on all checks, and limited recovery for reimbursements on forged instruments to the 30–day period after the statement

is sent to the customer, regardless of whether the bank used ordinary care.[1] Chesler denied ever seeing this new agreement.

{¶ 8} Chesler testified that Velez was permitted to sleep at the loft two or three times a week for a few weeks when he needed a place to stay but he did not know that Velez had a criminal record. He further testified that there were loose checks in the checkbook and it was not kept in a locked drawer.

{¶ 9} Chesler acknowledged that he usually received the checking-account statements by the 15th of each month but it was not uncommon for him to ignore the statements for a week or two. The statement for the time period from April 1, 2008, to May 1, 2008, contained copies of three forged checks that had signatures unlike his own and totaled $485. The statement reflected that the forged checks contained numbers that were out of sequence for the checkbook. Chesler did not review this statement until June 16, 2008.

{¶ 10} The statement for the time period of May 2, 2008, to June 1, 2008, contained forged checks and again listed checks out of the proper sequence for the checkbook. Chesler notified the bank of these forgeries on June 16, 2008.

---

1. {¶ a} This agreement states:

{¶ b} 5. Waiver of Rights by the Bank. The Bank reserves the right to waive the enforcement of any of the terms of this Agreement with you with respect to any transaction or transactions. Any waiver will not affect the bank's right to enforce any of its rights with respect to other customers, or to enforce any of its rights with respect to other transactions with you and is not sufficient to modify the terms and conditions of this Agreement.

{¶ c} * * *

{¶ d} 23. * * * You are in the best position to discover a forged, unauthorized or missing signature or endorsement * * * or any other discrepancy relating to a check * * *. Therefore you should carefully examine your statements, cancelled checks and/or copies thereof, when you receive them. * * *

{¶ e} If you do not discover a forged, unauthorized or missing signature or an alteration promptly after the Bank has sent or otherwise made your statements and cancelled checks available to you, you agree to assert against the Bank * * * (b) any forged, unauthorized or missing signature or alteration by the same wrongdoer on items paid by the bank after you have had a reasonable amount of time (not to exceed 30 days) to examine the statement containing or reflecting the first forged, unauthorized or missing signature or alteration but before the bank receives notice of the problem from you [unless] you are able to prove that the Bank failed to exercise ordinary care in paying the item in question and that the Bank's failure substantially contributed to the loss * * * the loss will be allocated between you and the Bank. * * * [T]he Bank processes checks and other items by automated means and does not visually examine or verify signatures on all checks or other items. You agree that the bank does not fail to use ordinary care because it uses these automated procedures. * * *

{¶ f} If you have not discovered and reported a forged, unauthorized or missing signature or endorsement * * * within 30 days of the date on which the first statement containing or reflecting * * * those items was mailed to you or otherwise made available to you, you agree not to assert that problem against the Bank. This 30-day limitation takes priority over the provisions in the previous paragraph and applies regardless of whether you or the Bank exercised ordinary care with respect to the item in question * * *.

{¶ 11} Upon cross-examination, Chesler called Dollar Bank's security investigator, Melinda Augustine. Augustine indicated that during the course of the bank's investigation of this matter, Chesler submitted affidavits for 25 forged checks from May through June 2008. She subsequently discovered that there were earlier forgeries from Velez in April 2008. Following its investigation, the bank determined that it would reimburse Chesler for only the April checks, for $485, but denied reimbursement on the remaining checks because it concluded that if Chesler had promptly reviewed the statement containing the April forged checks, then Velez's later forgeries, after the original 30–day time period, could have been prevented.

{¶ 12} Augustine testified that not all of the forged checks were cashed at Dollar Bank branches. With regard to the checks cashed at Dollar Bank, the teller must ask for the payee's identification, but if the payee is a Dollar Bank customer, then the Dollar Bank card will suffice. She admitted that the bank has the ability to verify that the drawer's signature is genuine. The bank does not do so, however, unless the check is written for over a specific amount. In general, the teller is not responsible for verifying the drawer of the check, and the customer is supposed to review the statement each month and notify the bank of any irregularity. The bank does contact the customer if it detects suspicious activity such as check kiting[2] and does monitor certain debit-card transactions. Finally, Augustine testified that in the criminal proceeding against Velez, Dollar Bank is listed as the victim to whom restitution must be made, and the amount of restitution is $18,720.

{¶ 13} At the conclusion of the plaintiff's case-in-chief, Dollar Bank moved for a directed verdict pursuant to R.C. 1304.35. The trial court denied this motion, and Dollar Bank presented testimony from Melinda Augustine and Cynthia Grey.

{¶ 14} Augustine testified that the forgeries that plaintiff reported to the bank were all from his June 2008 statement. Augustine then conducted an investigation and learned that Velez had forged other instruments in April 2008. On this information, the bank determined that the forgeries were not reported in a timely fashion, so it denied reimbursement for all but $485 from April 2008.

{¶ 15} Augustine further testified that Velez opened a Dollar Bank checking account in May 2008. As a Dollar Bank customer, he could present his bank card in order to cash a check.

---

2. "Check kiting" has been defined as the tender and deposit of "checks between two accounts, artificially inflating the balance of the accounts such that it appears the accounts are significantly funded when in actuality, the funds do not exist." *State v. Copeland,* Butler App. No. CA2003–12–320, 2005-Ohio-5899, 2005 WL 2937282, ¶ 41.

{¶ 16} On cross-examination, Augustine admitted that if an individual attempted to cash a check for $10,000, the teller would attempt to verify the drawer's signature. She also admitted that the bank subsequently had an investigator go to Chesler's home, but she denied that the bank conspired to blame him for the manner in which he stored the checks as a pretext for denying reimbursement in this matter.

{¶ 17} Cynthia Grey, a private banker with Dollar Bank, testified that the May 2, 2008 statement was printed on that date and then mailed the following day from the Pittsburgh operation center. The June 2, 2008 statement was mailed on June 4, 2008. On each statement, the checks are listed in numerical order.

{¶ 18} Based upon the 30–day period for asserting that the bank has paid on a forged indorsement, Grey stated that Chesler had 30 days from the May 2, 2008 statement in which to report any forgeries. She further stated that by operation of the June 1, 2007 agreement, the 30–day period takes priority and applies regardless of whether the bank exercised ordinary care in paying the forged instrument.

{¶ 19} In a written opinion, the trial court concluded:

There was no testimony that the appearance of three checks totaling less than $500.00 made payable to a man Plaintiff regularly paid, would have been sufficient to trigger any belief that multiple forgeries were occurring on Plaintiff's corporate checking account. * * * [T]here is no evidence that additional security measures alone would have prevented the theft. * * * Although each bank teller requested and received Mr. Velez's driver's license, not one teller attempted to match or compare [this signature to Chesler's signature card].

{¶ 20} The trial court rendered a verdict in favor of Chesler and against Dollar Bank in the amount of $18,720. Dollar Bank now appeals and assigns two errors for our review.

Assignment of Error One:

The trial court erred, as a matter of law, in not concluding that the appellee's claims against Dollar Bank were barred pursuant to O.R.C. sec. 1304.35 and/or Dollar Bank's policies and procedures because plaintiff failed to exercise "reasonable promptness" in reviewing his monthly account statements.

{¶ 21} Within this assignment of error, Dollar Bank asserts that the trial court erroneously required Dollar Bank to reimburse Chesler for the forged checks because Chesler failed to exercise "reasonable promptness" in examining his bank statements, so he is therefore barred from recovering under R.C. 1304.35(D).

{¶ 22} Judgments supported by some competent, credible evidence relating to all the essential elements of the case will not be reversed by a reviewing

court as being against the manifest weight of the evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

■ {¶ 23} Further, with regard to the substantive law, the "Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss." *Ed Stinn Chevrolet, Inc. v. Natl. City Bank* (1986), 28 Ohio St.3d 221, 226, 28 OBR 305, 503 N.E.2d 524, modified on rehearing (1987), 31 Ohio St.3d 150, 31 OBR 316, 509 N.E.2d 945. A check bearing a forged drawer's signature is not "properly payable" pursuant to R.C. 1304.24, and if the bank pays the check, the bank is generally liable to its customer. Id. at 227.

{¶ 24} There are exceptions to this rule, however. *RDH Ents., Inc. v. Farmers & Merchants Bank,* Montgomery App. No. 19934, 2003-Ohio-6247, 2003 WL 22764429.

{¶ 25} R.C. 1304.35 contains an exception to this rule and sets forth the customer's duty to discover and report an unauthorized signature or alteration. R.C. 1304.35 states:

(A) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.

\* \* \*

(C) If a bank sends or makes available a statement of account or items pursuant to division (A) of this section, the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

(D) If the bank proves that the customer failed with respect to an item to comply with the duties imposed on the customer by division (C) of this section, the customer is precluded from asserting either of the following against the bank:

(1) The customer's unauthorized signature or any alteration on the item if the bank also proves that it suffered a loss by reason of that failure;

(2) *The customer's unauthorized signature or alteration by the same wrong-doer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.*

(E) If division (D) of this section applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the bank's failure substantially contributed to the loss, the loss is allocated between the customer who is precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with division (C) of this section and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under division (D) of this section does not apply.

(Emphasis added.)

{¶ 26} Under this provision, as explained in *Chester Twp. Bd. of Trustees v. Bank One, N.A.,* Geauga App. No.2005–G–2660, 2007-Ohio-3365, 2007 WL 1881311, ¶ 34:

If the customer has not exercised "reasonable promptness" in examining its bank statements and has not promptly notified the bank of unauthorized signatures, then the customer is precluded from asserting subsequent unautho-rized payments from the "same wrongdoer" if such subsequent items were (1) "paid in good faith" and (2) "before the bank received notice from the customer of the unauthorized signature," provided that (3) the customer had at least 30 days to examine the initial statement. However, even if the "same wrongdoer" provision of R.C. 1304.35(D) applies to unauthorized signatures, the customer still has the opportunity to demonstrate that the bank failed to exercise ordinary care in paying the item. If the customer is successful in that regard, the loss is allocated proportionately between the customer and the bank according to the extent each contributed to the loss. Moreover, if the customer can demonstrate that the bank did not pay the item in good faith, it can pursue items from the same wrongdoer, as the preclusion in R.C. 1304.35(D) does not apply. If the customer waits more than one year to report an unauthorized signature, the customer is barred from recovering against the bank, regardless of the bank's lack of care in paying the instrument.

{¶ 27} Relying upon *Tatis v. U.S. Bancorp* (C.A.6, 2007), 473 F.3d 672, 674, Dollar Bank asserts that the 30–day time limit set forth in R.C. 1304.35 operates as a limitations period that bars recovery for the forgeries that occurred within the 30 days prior to his giving notice to the bank because he had failed to review his statements and report the forgeries in that time period. In opposition,

Chesler asserts that under the plain language of R.C. 1304.35(D), the 30–day time period set forth in R.C. 1304.35 is applicable only once the "bank proves that the customer failed with respect to an item to comply with the duties imposed on the customer by division (C) of this section," i.e., once the bank proves that the customer did not "exercise reasonable promptness in examining the statement" and "should reasonably have discovered the unauthorized payment."

{¶ 28} The Official Comment for this provision states:

The "safe harbor" provided by subsection (a) serves to permit a bank, based on the state of existing technology, to trigger the customer's duties under subsection (c) by providing a "statement of account showing payment of items" without having to return the paid items, in any case in which the bank has not agreed with the customer to return the paid items. The "safe harbor" does not, however, preclude a customer under subsection (d) from asserting its unauthorized signature or an alteration against a bank in those circumstances in which under subsection (c) the customer should not "reasonably have discovered the unauthorized payment." Whether the customer has failed to comply with its duties under subsection (c) is determined on a case-by-case basis.

{¶ 29} Further, the plain language of the statute supports Chesler's interpretation: "If the bank proves that the customer failed with respect to an item to comply with the duties imposed on the customer by division (C) of this section, the customer is precluded * * *." R.C. 1304.35(D).

{¶ 30} In addition, this was the analysis applied in *Mueller v. Miller*, 162 Ohio App.3d 698, 2005-Ohio-4213, 834 N.E.2d 862. The *Mueller* court stated: "Having failed, as a matter of law, to exercise 'reasonable promptness' to examine the monthly statements, the statute then abridges appellants' ability to challenge other forged checks signed by the 'same wrongdoer.' " Id. at ¶ 31.

{¶ 31} Further, although *Tatis* appears to apply R.C. 1304.35(D) as a limitations period, without a predicate inquiry as to whether the customer exercised "reasonable promptness" in reviewing the statement, it is undisputed that the customer in that case did not report the first forgery until five months after it was reported in a bank statement. Therefore, *Tatis* did not squarely present the issue of whether the customer had acted with reasonable promptness, as it was established that it had not done so.

{¶ 32} In this matter, the trial court specifically found that "[p]laintiff paid Mr. Velez for various odd jobs, and he paid Mr. Velez in both cash and checks and that Mr. Velez had performed work for Plaintiff for a period extending over three years." The trial court therefore concluded that the three forged checks noted in the May 2008 statement were not "sufficient to trigger any belief that

multiple forgeries were occurring on Plaintiff's corporate checking account." The trial court further concluded that "the conduct of Mr. Chesler and his failure to immediately review one statement at issue after its receipt does not rise to the level of neglect." The record contains competent and credible evidence to support these determinations. Although plaintiff did not immediately review the May 2008 statement, there is no basis upon which we may overturn the trial court's conclusion that plaintiff acted with "reasonable promptness" under the circumstances of this case. We are therefore precluded from finding that plaintiff's claims are barred by the 30–day period set forth in R.C. 1304.35(D). The first assignment of error is without merit.

{¶ 33} Dollar Bank's second assignment of error states:

The trial court erred, as a matter of law, by not finding that appellee's conduct substantially contributed to the forgeries.

{¶ 34} In this assignment of error, the bank contends that the trial court ignored plaintiff's statutory duty to prevent a forgery from occurring under R.C. 1303.49 and erred in failing to find that plaintiff's conduct substantially contributed to the forgeries.

{¶ 35} R.C. 1303.49 states:

(A) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(B) Under division (A) of this section, if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded under division (A) of this section from asserting an alteration or forgery and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

(C) Under division (A) of this section, the burden of proving that a failure to exercise ordinary care contributed to an alteration of an instrument or to the making of a forged signature on an instrument is on the person asserting the preclusion. Under division (B) of this section, the burden of proving that a failure to exercise ordinary care in paying or taking an instrument substantially contributed to loss is on the person precluded.

{¶ 36} Under this provision, if the customer's failure to exercise ordinary care substantially contributed to the forged signature, then he is precluded from asserting the forgery against the bank that pays it in good faith. *Mueller*, 162 Ohio App.3d 698, 2005-Ohio-4213, 834 N.E.2d 862. If, however, the bank's failure

to exercise ordinary care substantially contributed to the loss, the loss will be allocated between the two parties. *RDH Ents., Inc. v. Farmers & Merchants Bank,* Montgomery App. No. 19934, 2003-Ohio-6247, 2003 WL 22764429.

{¶ 37} The Official Comment to R.C. 1303.49 further provides:

No attempt is made to define particular conduct that will constitute "failure to exercise ordinary care [that] substantially contributes to an alteration." Rather, "ordinary care" is defined in Section 3–103(a)(7) in general terms. The question is left to the court or the jury for decision in the light of the circumstances in the particular case including reasonable commercial standards that may apply.

{¶ 38} The burden of demonstrating the lack of ordinary care under R.C. 1303.49(A) falls on the person or entity that is asserting the preclusion. *Nesper v. Bank of Am.,* Ottawa App. No. OT–03–012, 2004-Ohio-1660, 2004 WL 628783.

{¶ 39} Dollar Bank relies upon *Jurcisin v. Fifth Third Bank,* Clermont App. No. 2006–10–078, 2007-Ohio-3000, 2007 WL 1731419, in support of its claim that Chesler failed to use ordinary care in securing his checkbook and therefore substantially contributed to the loss in this matter.

{¶ 40} In *Jurcisin,* the bank customer chose as her roommate a woman with "serious credit problems following her divorce and * * * 'red flags all over the place'" and gave the roommate her debit card with her signature on it. Jurcisin kept her financial records unsecured and authorized the roommate to handle these documents during a move. The facts of *Jurcisin* are therefore distinguishable from this matter because Chesler did not have reason to distrust Velez, did not entrust him with his checkbook, and did not authorize him to handle his financial records. On this record, there is no basis on which we may overturn the trial court's determination that Chesler's conduct did not substantially contribute to the forgeries.

{¶ 41} The second assignment of error is without merit.

Judgment affirmed.

STEWART, P.J., and GALLAGHER, J., concur.